# CASES DETERMINED

IN THE

# SUPREME COURT OF NEBRASKA

AT

## JANUARY TERM, 1909.

STATE, EX REL. JOHN M. RAGAN, APPELLEE, V. GEORGE C. JUNKIN, SECRETARY OF STATE, APPELLANT.

FILED AUGUST 18, 1909. No. 16,274.

1. Constitutional Law: FREEDOM OF SPEECH: RIGHT OF ASSEMBLY AND PETITION. The legislative enactment in sections 1 and 10, ch. 53, laws 1909, that candidates for judicial and educational offices shall not be "nominated, indorsed, recommended, censured, criticised on referred to in any manner by any political party, or any political convention or primary, or at any primary election," is a violation of section 5 of the bill of rights, declaring that "every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth when published with good motives, and for justifiable ends, shall be a sufficient defense," and of section 19 of the bill of rights, declaring that "the right of the people, peaceably, to assemble to consult for the common good, and to petition the government, or any department thereof, shall never be abridged."

2. ———: RIGHT OF ASSEMBLY: POLITICAL CONVENTION. A political convention is an assemblage within the meaning of the constitutional provision that the right of the people to assemble to consult for the common good shall never be abridged.

3. Elections: SELECTION OF CANDIDATES: CONSTITUTIONAL GUARANTIES. In prescribing a form of official ballot which limits the printed names of candidates for judicial and educational offices to nominees by petitions containing 5,000 names each and in depriving all electors except 500 in each county of the right to take part in nominating a particular candidate, chapter 53, laws 1909, violates section 22 of the bill of rights, declaring that "all elections

4 (1)

shall be free, and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise."

4. **Statutes:** VALIDITY. Where it appears on the face of a legislative act that an inducement for its passage was a void provision, the entire act falls.

5. ——: ——. Where valid and invalid parts of a legislative act are so intermingled that they cannot be separated in such a manner as to leave an enforceable statute expressing the legislative will, no part of the enactment can be enforced.

APPEAL from the district court for Lancaster county: ALBERT J. CORNISH, JUDGE. *Affirmed.*

*William T. Thompson, Attorney General, Grant G. Martin* and *Arthur F. Mullen,* for appellant.

*John C. Cowin* and *Charles O. Whedon, contra.*

ROSE, J.

Defendant is secretary of state, and as such was requested to place the name of relator on the primary ballot as a republican candidate for judge of the supreme court at the primary election to be held August 17, 1909, but refused on the ground that compliance would be a violation of the nonpartisan judiciary act passed at the last session of the legislature. Laws 1909, ch. 53. The controversy thus raised was submitted to the district court for Lancaster county, where the act in question was held void as being an invasion of the constitutional right of free assembly, of free speech and of a free ballot. A peremptory writ of mandamus was accordingly allowed, directing defendant to place relator's name on the primary ballot in compliance with the primary election law and in disregard of the nonpartisan judiciary act. From the order allowing the writ defendant appeals, and his record presents for review the correctness of the ruling of the trial court.

The first section of the nonpartisan judiciary act authorizes party nominations at conventions and primaries, and concludes as follows: "But candidates for the fol-

lowing offices, to wit, chief justice of the supreme court, judge of the supreme court, judge of the district court, county judge, regent of the state university, superintendent of public instruction and county superintendent of public instruction shall not be nominated, indorsed, recommended, censured, criticised or referred to in any manner by any political party, or any political convention or primary, or at any primary election; and no party name or designation shall be given upon any ballot to any candidate, for any of said offices, and hereafter all candidates for all of said offices shall be nominated only by petition, and no candidate for any of said offices shall appear on any party ticket." Laws 1909, ch. 53, sec. 1. According to this provision candidates for judicial and educational offices cannot be "nominated, indorsed, recommended, censured, criticised or referred to in any manner by any political party, or any political convention or primary, or at any primary election." Does the bill of rights forbid such an enactment? It declares: "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth when published with good motives, and for justifiable ends, shall be a sufficient defense." Constitution, art. I, sec. 5. "The right of the people, peaceably, to assemble to consult for the common good, and to petition the government, or any department thereof, shall never be abridged." Constitution, art. I, sec. 19. The first provision quoted protects every person in his right to speak, write and publish on all subjects, and the next permits him to assemble with others to consult for the common good. A political meeting or convention is an assemblage within the meaning of the constitutional provision that the right of the people to assemble and consult for the common good shall never be abridged. The right of a citizen to speak, write and publish on all subjects does not terminate when he enters a political convention or assemblage. With good motives and for justifiable ends the members of such a body may

jointly speak and publish the truth about candidates for office, and this right extends to aspirants for judicial and educational offices. Judge Cooley, in discussing the constitutional liberty of the press and of speech, said: "There are cases where it is clearly the duty of every one to speak freely what he may have to say concerning public officers, or those who may present themselves for public positions. Through the ballot-box the electors approve or condemn those who ask their suffrages." Cooley, Constitutional Limitations (7th ed.), p. 617. Delegates and members of political organizations not only take with them into their party councils the inalienable right to speak, write and publish on all subjects, but the full benefit of this privilege can only be obtained by united action. Political parties are the great moving forces in the administration of public affairs, and their influence in elections cannot be eliminated by the legislature as long as the right to assemble and speak the truth remains in the charter of our liberties. Published criticisms of candidates, officers and policies are potent factors in the struggle for civic virtue and cannot be suppressed by legislative enactment. The privilege of speaking and publishing the truth with good motives and for justifiable ends was not inserted in the bill of rights by accident. The doctrine that the truth as to a man's conduct is no justification for publishing it in the press originated in the Star Chamber, and was in high favor in that tribunal when printing became an effective means of disseminating what honest men said about the abuses of official power and the conduct and policies of public men. The hostility to such a restriction of free speech and of a free press resulted in the adoption of section 5 of the bill of rights. The nonpartisan judiciary act is void in so far as it declares that candidates for judicial and educational offices shall not be "nominated, indorsed, recommended, censured, criticised or referred to in any manner by any political party, or any political convention or primary, or at any primary election."

The act under consideration prescribes the manner of nominating candidates for judicial and educational offices and the form of ballot to be used at the November election. In this connection the following provisions are assailed as unconstitutional: "Candidates for public office may be nominated otherwise than by convention, committee or primary meeting in the following manner: A certificate of nomination containing the name of the candidate for the office to be filled, stating the name, residence, business and post office address of the candidate shall be signed by electors residing in the district or political division in which the officers are to be elected and filed with the clerk of the village, city or county, or with the secretary of state as the case may be. The number of signatures shall not be less than five thousand; not more than five hundred of which shall be from one county, when the nomination is for chief justice or judge of the supreme court." Laws 1909, ch. 53, sec. 3. Under the provisions quoted only 500 electors in a county can lawfully sign the nominating certificate of a candidate for judge of the supreme court, though there may be more than 5,000 legal voters therein. In other words, 500 electors in a county may participate in nominating a candidate for judge of the supreme court, and when they do so the other voters in the same county are deprived of the right to sign a nominating certificate for the same candidate. In Adams county, where relator resides, nearly 5,000 electors voted at the general election in 1908. Only 500 of them, under the nonpartisan judiciary act, can take part in nominating him for judge of the supreme court, and this would be true if the entire electorate of 5,000 were a unit in demanding an opportunity to vote for him as a regular nonpartisan candidate at the November election. For want of the signatures of the supporters who are deprived of the right to sign the nominating certificate of the candidate of their choice he may not be nominated. In such an event his name would not be printed on the official ballot for the November election, and their right

to vote for him thereat as a regular nominee would be lost. Under these circumstances the empty privilege of writing on official ballots in blank spaces the names of persons who have not been nominated, with the prospect of having such votes classified in the election returns as "scattering," is not the full measure of an elector's rights within the meaning of the constitution. Electors who desire to vote for a particular candidate for judge of the supreme court at the November election should be allowed to take part in nominating him or in whatever preliminary step the law requires as a condition of allowing his name to be printed on the official ballot. This privilege is protected by the following section of the bill of rights: "All elections shall be free; and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise." Constitution, art. I, sec. 22. When the lawmakers enter the party caucus, the party convention, the party committee, and the primary to make regulations, they must act within the limits of the foregoing provision. The elective franchise may be invaded by such regulations, when they prescribe the forms of the official ballots to be used at the general election and establish the methods of making nominations. These forms and methods may be as effective to deprive the voter of his rights as direct legislation relating to the November election. Chief Justice HOLCOMB, in discussing a primary law, said: "It is a part of the election machinery by which is determined who shall be permitted to have their names appear on the official election ballot as candidates for public office. To say that the voters are free to exercise the elective franchise at a general election for nominees, in the choice of which unwarranted restrictions and hindrances are interposed, would be a hollow mockery. The right to freely choose candidates for public offices is as valuable as the right to vote for them after they are chosen. Both these rights are safeguarded by the constitutional guaranty of freedom in the exercise of the elective franchise." *State*

*v. Drexel,* 74 Neb. 776. In the case cited Chief Justice HOLCOMB adopted the following language of Professor Wigmore: "Nominations for public office may be considered in two aspects. *First,* it involves the right of every eligible person to be voted for by any elector who desires to do so; *secondly,* it involves the right of each elector to exercise choice among all who are eligible. The two rights may be protected by the same legislation, but it is important to remember that there is involved not merely the right of an individual to be a candidate, but the right of every other person to select him for the office; practically the feasibility of independent political movements depends upon the second right." 23 American Law Review, 730. *State v. Drexel,* 74 Neb. 776, was cited with approval by the supreme court of Illinois in *People v. Board of Election Commissioners,* 221 Ill. 9, where the following language was used by that court: "When statutes are enacted which regulate the form of the ballot to be used, what shall appear upon the ballot, and how the candidates whose names shall so appear shall be chosen, the provision of the bill of rights applies to the new condition. The right to choose candidates for public offices whose names will be placed on the official ballot is as valuable as the right to vote for them after they are chosen, and is of precisely the same nature. There is scarcely a possibility that any person will or can be elected to office under this system unless he shall be chosen at a primary election, and this statute, which provides the methods by which that shall be done and prescribes and limits the rights of voters and of parties, must be regarded as an integral part of the process of choosing public officers, and as an election law." The supreme court of Illinois in a later case said: "The power of the individual voter at the polls to cast his vote, untrammeled, for the candidate of his choice is no more sacred than the right of the individual member of a political party to express his choice for party candidates at a primary election." *Rouse v. Thompson,* 228 Ill. 522. In

depriving electors of the right to participate in nominating for judicial and educational offices the candidates of their choice, the nonpartisan judiciary act violates section 22 of the bill of rights.

The duty to uphold all valid legislation has led to an earnest effort to find some substantial basis for sustaining those provisions which are not directly inhibited by the constitution. This cannot be done, however, if either of the invalid provisions was an inducement to the passage of the bill. The void part of section 1 is repeated in section 10 with the legislative announcement that it is "declared to be the purpose of the people of Nebraska to remove all of said offices entirely from the domain of party politics." The leading provision for carrying into effect that purpose, the one disclosed by the act itself, is the void provision that candidates for those offices shall not be "nominated, indorsed, recommended, censured, criticised or referred to by any political party, or any political convention or primary, or at any primary ·election." It is true the legislature prescribed a form for a nonpartisan ballot and prohibited party designation of candidates thereon. This, however, did not prevent party activity in the election of judicial and educational officers. The legislative intention being to remove such offices from the domain of party politics, and the leading provision for carrying that purpose into effect being void, the bill necessarily shows on its face that the void part was an inducement to the passage of the act.

Even if the unconstitutional provisions were not the inducing cause of the legislation, the entire act must fall, unless the valid and invalid parts can be separated in such a way as to leave an independent statute capable of enforcement. The intention of the legislature must be expressed by written language. In segregating void provisions the language itself must be separated. "Where a part of an act is unconstitutional," wrote Chief Justice Holcomb, "because contravening some provision of the fundamental law, the language found in the invalid por-

tion of the act can have no legal force or efficacy for any purpose whatever." *State v. Insurance Co.*, 71 Neb. 335. It is equally true that what remains must express the legislative will, independently of the void part, since the court has no power to legislate. These propositions are elementary, and citation of precedents to support them is unnecessary. For the purpose of applying the rules stated, section 1 of the act is here reproduced: "Any convention or primary meeting, as hereinafter defined, held for the purpose of making nominations for public offices, and also voters of the number hereinafter specified, may nominate candidates for public offices, to be filled by election within the state; a convention or primary meeting within the meaning of this act is an organized assemblage of voters, representing a political party which at the last election before the holding of such conventions or primary meetings, polled at least one per cent. of the entire vote in the state, county, or other subdivision or district for which the nomination is made. A committee appointed by such convention or primary meeting, may also make nominations for public offices, and authorized to do so by resolution, duly passed by the convention or meeting at which said committee was appointed. A state convention of any political party may take action upon any constitutional amendment, which is to be voted upon at the following election, and said convention may declare for or against such amendment, and such declaration shall be considered as a portion of their ticket to be filed with the secretary of state and by him certified to the various county clerks. But candidates for the following offices, to wit, chief justice of the supreme court, judge of the supreme court, judge of the district court, county judge, regent of the state university, superintendent of public instruction and county superintendent of public instruction shall not be nominated, indorsed, recommended, censured, criticised or referred to in any manner by any political party, or any political convention or primary, or at any primary elec-

tion; and no party name or designation shall be given upon any ballot to any candidate, for any of said offices, and hereafter all candidates for all of said offices shall be nominated only by petition, and no candidate for any of said offices shall appear on any party ticket." Laws 1909, ch. 53, sec. 1. In this section the void provision already described limits the operation of what precedes it. The first part of the section authorizes nominations by conventions and primary meetings. This portion, with the void part stricken out, would authorize partisan nominations of candidates for judicial and educational offices, which is exactly the opposite in that respect of what the legislature intended. With the qualifying and void part eliminated, therefore, the first part of the section does not express the legislative will. These observations apply also to section 10, where the void provision in the first section is repeated.

Section 3 makes provision for nominating candidates for judicial and educational offices by petition or certificate of nomination. This section contains the void provision which deprives all electors in a county except 500 of the right to sign the nominating certificate of a particular "candidate by petition." The petition described in section 3 is a substantive part of the legislation, and reference to it is repeatedly made throughout the act. With the void provision stricken out, the petition mentioned by the legislature in other parts of the bill would not be the petition to which the legislature referred. It is therefore clear that, with the unconstitutional provisions eliminated, the remainder of the act would not be what the lawmakers in fact enacted. There is no lawful way to separate the valid and invalid portions so as to leave an enforceable statute expressing the will of the legislature. It follows that no part of the act can be sustained.

The judgment of the district court is

AFFIRMED.

REESE, C. J., absent and not sitting.

DEAN, J., dissenting.

I am unable to concur in the opinion of the majority of the court. From the arguments of counsel and the law applying to the facts it does not clearly appear that the act in question comes within the inhibitory provisions of the fundamental law that have been invoked to destroy it. The act is attacked solely on constitutional grounds, and thus the recognized rules of this and other jurisdictions, in cases involving constitutional construction, should be applied to determine the right of the act to take a place among the laws of the state.

Viewed from any point there is a delicacy surrounding the discussion of some features of the case that would be gladly avoided, but due regard for the performance of a public duty otherwise directs. The legislature has for many years been modifying the general election laws in response to public demand. It gave us the Australian ballot system, and events have proved its wisdom. It gave us the state wide primary law, and, while it may be defective in some respects, it is within the province of the legislature to amend it. In any event, it is not likely the people will surrender their power or that a return will be had to the convention system of nominating candidates for public office. The nonpartisan judiciary act, with but 7 negative votes in the senate and but 27 negative votes in the house recorded against it, is but an expansion of the general primary system. Its principle is not new to the statute books of five states or more. It is not an untried experiment.

In the preservation of the constitutional checks and balances of our system of government is involved the preservation of government itself. It is fundamental that the legislative, executive and judicial departments should each be free to perform their separate functions without interference from either of the others. Applying this principle to a legislative act, the validity whereof is attacked on the sole ground of being repugnant to the con-

stitution, a decent respect for the legislative and executive departments which have respectively passed and approved it inculcates an abiding desire on the part of the judiciary to refrain from disturbing it except for the most weighty reasons. An act of the legislature is presumed to be constitutional. This presumption continues until the contrary is affirmatively shown by the challenging party. The legislature is presumed to know, to interpret, and to make effective by competent legislative enactment the will of the people, and every act passed that is conformable to the constitution has all the power of that instrument behind it. All intendments of the law favor these presumptions. The judiciary is not the master of the constitution but merely its interpreter, and in the exercise of this prerogative it is not the court's duty to declare an act unconstitutional unless it clearly and beyond question contravenes some provision of the fundamental law, and every reasonable doubt will be resolved in favor of sustaining the act. By close adherence to this long familiar rule may the judiciary preserve itself from the imputation of even seeming to invade the legislative realm. It may thus avoid "bench legislation," an insidious judicial offense, and one which may in time, if indulged, imperil the perpetuity of our institutions. Cooley, Constitutional Limitations (7th ed.), p. 227; Professor Wigmore, 23 Am. Law Review, 719; *City of Topeka v. Gillett*, 32 Kan. 431; *Ogden v. Saunders*, 12 Wheat. (U. S.) *213; *Hoover v. Wood*, 9 Ind. 286; *Wellington, Petitioner*, 16 Pick. (Mass.) 87.

The majority opinion holds: "Political parties are the great moving forces in the administration of public affairs." That evil influences and impure motives should creep into the management of political parties are circumstances that have been long recognized and are everywhere deplored. But the act is not aimed at the destruction, or even the impairment, of an exercise of the legitimate functions of political parties. The relator's argument on this point indicates he is seized with this fear,

and in a manner his protest against the act is suggestive of John's protest at Runnymede. The nonpartisan act leaves the solution of political questions to political parties. It appears to be only a well-directed protest against the domination of nonpolitical departments of government by partisan political influence. Justice, in the proper application of its principles, is no respecter of party lines. No logical reason for the domination of our school system by the spirit of partisanship can be advanced. There is sufficient latitude in public questions and public problems, that are in their nature purely political, to absorb the legitimate attention of those whose guiding hands would direct the destinies of the political parties and thus indirectly, but none the less potently, the destiny of state and nation. In the departments sought to be affected, the legislature has the right within the bounds of the fundamental law to exert its power to the end they may be effectively removed by legislative enactment from the domain of partisan politics.

Who will question the propriety of legislation to the end the judiciary may avoid even the appearance of securing place and power at the hands of the cunning captains of political patronage? He was a wise writer who said: "A gift doth blind the eyes." Is the gift less seductive, and will it less effectually dull the eye of the magistrate to the iniquities of the giver because it takes the form of preferment in office? No one will question the propriety of giving added meaning to the vital truth expressed in the motto of our state, "Equality before the law." By what means may this result be the better maintained? Will it be by an immersion of the judiciary in the seething pool of partisan politics, or will it be by its separation from that stirring feature of political life in the manner pointed out by the act in question? The legislature, coming from the body of the people, and charged with legislative responsibility, solved the problem in a manner satisfying to itself by the passage of the nonpartisan judiciary act. Who then is to pass upon the wisdom or the un-

wisdom, the expediency or the inexpediency, that may be involved in its declared purpose? Not the judiciary, for it is not within its constitutional province, but the legislature alone in the exercise of its power to amend and its power to repeal. Will it be seriously urged that loyalty to party or to party leadership, because of past achievement or promise of future performance, or for any sane reason, is always and everywhere and regardless of all else the paramount duty of the citizen, whether in or out of office? It is to be deplored that in some instances in public history, in the exuberance of an intense partisan spirit, loyalty to party leadership seems at times almost to have overcome loyalty to all else. Political parties will be always with us. They are inseparable from our form of government, but danger lies in the direction of the exercise of a spirit of excessive and unreasoning loyalty to party or to party leaders. See Messages of the Presidents (Washington), p. 54; 1 Bryce, The American Commonwealth, p. 104.

The opinion holds in effect that because, under the provisions of the act in question, only 500 petitioners in Adams county, the home of relator, can take part in nominating him, he might thereby be prevented from receiving a nomination, and the electorate of his county, which contains about 5,000 electors, would thus be deprived the opportunity of voting for him. The point does not seem to be well taken. It does not appear reasonable to believe the enforcement of this feature of the act would be fraught with results so serious. There are eight counties contiguous to that of relator, having a population in each that is not much, if any, less than that of Adams county. Thus, in his own and in the eight neighboring counties, with one additional, the names of the requisite 5000 signatures might be obtained by the relator, or by any qualified candidate. In the state at large the entire vote amounts to approximately 250,000. Two per cent. of that number is the number of signatures required to place the name of relator in nomination. The most populous

county in the state has approximately 25,000 voters. Two per cent. of that number is the maximum number of signatures permitted by the act in any one county, so that upon a percentage basis, while it is true no percentage is named in the act, it is seen there is no distinction between the different portions of the state and no distinction as to the number of signatures required of candidates for position in the same class. The act seems to impose no unusual or unreasonable burden or restriction in the requirement that the signatures of 5,000 electors shall be obtained, with the limit of 500 in any one county. These are mere details of the law, regulations that are within the power of the legislature to prescribe. By the arrangement of the ballot provision is made that the voter may write in the names of such additional persons as may commend themselves to his choice. *Healey v. Wipf,* 117 N. W. (S. Dak.) 521; 23 Am. Law Review, 719; Paine, Elections, sec. 5.

The act is not obnoxious to the constitutional prohibition against class legislation because it includes all candidates for judicial position in courts of record, and all candidates for executive school position. It adds no new qualifications to the constitutional requirements respecting the position sought by relator. *State v. Hunter,* 38 Kan. 578; *State v. Township Committee,* 50 N. J. Law, 496, 14 Atl. 587; *City of Topeka v. Gillett,* 32 Kan. 431; *State v. Berka,* 20 Neb. 375; *State v. Farmers & Merchants Irrigation Co.,* 59 Neb. 1. The majority opinion cites *State v. Drexel,* 74 Neb. 776. There a candidate for nomination was required, by the act there in question, to pay a sum equal to 1 per cent. of the salary of the desired office, for the term, to entitle his name to appear on the primary ballot. In brief, the act required him to purchase the right to submit his name to the electorate as a party candidate for nomination. The act was held to be clearly repugnant to the constitution, but it does not clearly appear that the rule there invoked applies to the facts in the case at bar. *People v. Board of Election Commis-*

*sioners,* 221 Ill. 9, and *Rouse v. Thompson,* 228 Ill. 522, are cited in the majority opinion. The soundness of all that is said in the cited portions of the cases may be conceded. For the most part they appear to show a connection between the primary election and the general election.

The opinion discusses two features that were not argued in the brief of relator. Reference is had to the feature limiting the number of signatures that may be obtained in any one county to 500, and to that other feature which discusses freedom of speech and the right to peaceably assemble. It is an established rule of this court that assignments which are not argued in the briefs of the party complaining are deemed to be waived and will receive no attention here. The reason for the rule and its application is sound. It is fair to all litigants, avoids surprise to counsel, and gives to each party an equal opportunity to be heard on contested matter. In *Brown v. Dunn,* 38 Neb. 52, the rule was applied by RAGAN, C.: "We will not examine errors alleged in a petition in error unless such errors are specifically pointed out and relied upon in the briefs filed in the case, under the rules of this court." In support of his ruling he cites *Phenix Ins. Co. v. Reams,* 37 Neb. 423. To the same effect are the following: *Peaks v. Lord,* 42 Neb. 15; *Madsen v. State,* 44 Neb. 631; *Blodgett v. McMurtry,* 54 Neb. 69; *Scott v. Chope;* 33 Neb. 41; *Glaze v. Parcel,* 40 Neb. 732; *Gulick v. Webb,* 41 Neb. 706; *Erck v. Omaha Nat. Bank,* 43 Neb. 613; *Johnson v. Gulick,* 46 Neb. 817; *Wood Mowing & Reaping Machine Co. v. Gerhold,* 47 Neb. 397; *Mandell v. Weldin,* 59 Neb. 699.

The majority opinion holds: "Where it appears on the face of a legislative act that an inducement for its passage was a void provision, the entire act falls," and that, "where valid and invalid parts of a legislative act are so intermingled that they cannot be separated in such a manner as to leave an enforceable statute expressing the legislative will, no part of the enactment can be enforced." Even assuming that the portions of the act in question

State v. Junkin.

are invalid which are pointed out by the majority opinion, yet it does not appear that they are so intermingled with the valid portions that they cannot be separated so as to leave an enforceable statute. The act in question would still be enforceable by omitting from its first section the following words: "Indorsed, recommended, censured, criticised or referred to in any manner." With these words omitted, the first section would provide that candidates for the judiciary and executive school offices "shall not be nominated * * * by any political party, or any political convention or primary, or at any primary election." Applying the same rule to the feature of section 3 of the act, which limits the number of signatures to 500 names in any one county, and with these words omitted, "not more than five hundred of which shall be from one county," the section would then read: "The number of signatures shall not be less than five thousand * * * when the nomination is for chief justice or judge of the supreme court." The limitation of 500 signatures to any one county is not essential to the practical operation of the act. With this feature omitted, 5,000 voters from any portion of the state would nominate, and thus the relator, by his own showing, would not be deprived of any substantial right. The act would then merely change the place of nomination from the floor of the party convention, or from the party primary, to the body of the people without regard to party affiliation.

Has a politcal party an inherent right to nominate party candidates for non-political offices? Are not all the people greater than a mere party subdivision of the people? Cooley, Constitutional Limitations (7th ed.), p. 247, concerning a legislative act, says: "The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall." In support of this view the author cites many authorities. The majority opinion contains a citation from *State v.*

5

*Insurance Co.,* 71 Neb. 335. Fairly construed it reaffirms the rule laid down by Judge Cooley. *Blair v. Ridgely,* 41 Mo. 63: "Outside of society, and disconnected with political society, no person has or can exercise the elective franchise as a natural right, and he only receives it upon entering into the social compact subject to such qualifications as may be prescribed by the state or body politic." *People v. Barber,* 48 Hun (N. Y.) 198: "The elective franchise is not a natural right of the citizen. It is a franchise dependent upon law by which it must be conferred to permit its exercise. *Spencer v. Board of Registration,* 1 McArthur (D. C.) 169, 29 Am. Rep. 582."

That part of the act which provides that candidates for judicial and educational offices cannot be censured or criticised is evidently intended to be merely advisory. It will not be seriously urged that either judges or educational officers should be immune from deserved censure or criticism by any person who has, or thinks he has, just cause for complaint.

The inducement for the passage of the act is not expressed in its details, but is found in its broader language, which is expressive of a laudable desire to separate the judicial and the school system from partisan political control by nonpartisan nominations and nonpartisan elections.

In the belief that the judgment of the trial court should be reversed, and the act in question sustained, this dissent is submitted.

FILED AUGUST 28, 1909.

LETTON, J., dissenting.

While I agree with much that is said in the majority opinion, I must dissent from the conclusion reached. That opinion holds:

1. That the provision of the law under consideration which declares that candidates for judicial and educational offices shall not be "nominated, indorsed, recommended, censured, criticised or referred to in any manner by any political party, or any political convention or

primary, or at any primary election" is void as being in violation of the provisions of the bill of rights protecting liberty of speech and the right of free public assembly. So far as the prohibition of free speech by citizens assembled together in conventions is concerned, this provision of the act is clearly and manifestly void. Its enforcement in this respect would be an assault of the gravest and most heinous character upon the liberty of the citizen, and one that no free people would long endure. It is opposed to that spirit of liberty which is our dearest heritage, and which should be most jealously conserved and strongly defended by legislature, courts and private citizen alike. It cannot be defended as a valid exercise of legislative power, and, indeed, counsel for respondent laudably has made no attempt to do so. But, perhaps recognizing its inability and the folly of attempting to curb and limit free speech and free assemblage in a land of liberty, the legislature wisely attached no penalty or punitive sanction to a violation of its commands in these respects. Since a disregard of this provision can meet no punishment, all that part of the act may be treated as surplusage. It may be considered as an indication of what the legislature would have liked to do if it had the power, or perhaps as advisory in its nature. But I cannot go so far as the majority in holding this whole provision void. Not all of it is obnoxious to or inhibited by any provision of the constitution. The regulation of primary elections is concededly within the province of the legislature, and that portion of this provision which prohibits the nomination of such candidates at any primary election is not in violation of any constitutional provision and is a proper regulation. The legislature may, as it did for many years before the passage of the Australian ballot law, leave the whole matter of the nomination of candidates and the preparation of ballots to be used at the general election to individual or party care; the only regulation at that time being that the elector should deliver in full view of the people assembled at

the polls a piece of paper with the name of the person voted for written or printed thereon and a pertinent description of the office (Gen. St. 1873, ch. 20, sec. 30) ; or it may take into its hands the entire control and direction of the nomination of candidates and the preparation and furnishing of official ballots. Its action in regard to these matters, where no constitutional right is assailed, is conclusive alike upon the courts and upon the citizen.

In this state the printing and furnishing of official ballots has for years been assumed by the state. No other ballots than those furnished by public authority can be used. The manner in which the names of candidates shall appear upon such official ballot, whether with or without party designation, is a matter entirely within the control and discretion of the legislature, provided only that in this respect no discrimination or partiality is shown which will defeat the constitutional requirements providing for "a free ballot and a fair count." Political parties may or may not be recognized by the legislature in regulating the form of ballots, and there is no constitutional requirement which compels their notice. The legislature has the option whether or not the ballots shall be "official" and printed at public expense, and whether party designations shall appear thereon, and it has the power to decide whether the names of candidates printed upon the "official ballots" shall be ascertained by petition, by convention, by primary election, or by any other manner which accomplishes the end sought, a reasonable limitation of the number of names necessary to print in order to afford every elector a fair opportunity to express his preference. While at the general election the elector may vote for whom he pleases by writing any name upon the ballot, it is manifestly impossible for the state to print in advance the name of every possible candidate, and the exercise of some method of selection is necessary to avoid needless expense and an unwieldy and cumbersome ballot. The state, too, has the right reasonably to classify offices, and to provide that candidates for certain offices

shall be selected by primary election and for others by petition. This state having heretofore adopted the primary system of nominations as to certain offices, it has the power to prohibit nominations at a primary election for such offices as to which it is provided nomination shall be by petition. In my judgment the prohibition of the nomination of candidates for judicial and educational offices at primary elections is a valid exercise of legislative power, but the prohibition of free speech and free assemblage contained in the act is not and ought not to be of more practical or legal effect than "sounding brass or a tinkling cymbal" or "the crackling of thorns under a pot."

2. Coming now to the provision limiting signatures to petitions for candidates for the office of supreme judge to not more than 500 in any one county: In its practical operation I seriously doubt whether this would hinder or obstruct any voter in the exercise of the elective franchise. Every one who has observed the degree of care and discrimination, or rather lack of these qualities, which the average man ordinarily employs before he affixes his name to petitions must come to the conclusion that, after obtaining 500 signers in a few counties in the more densely populated portion of the state, there would be little or no difficulty in filling the quota from the 80 or more counties left to canvass. But, however this may be, the possibility exists that the reputation of a candidate entirely fitted and qualified for, and who might adorn, the position may be so purely local that, unless the voters of his own immediate locality furnish the 5,000 names necessary under the law, thousands of voters in that locality would be placed at a serious disadvantage, as compared with voters in other parts of the state, by being compelled to write the name of their choice upon the official ballot, instead of its being printed thereon. The contingency is in my opinion remote, but it may happen. The unexpected often happens. It is the duty of the courts to preserve and uphold every constitutional safeguard thrown around the exercise of the elect-

ive franchise, and since the view taken by the majority is in the direction of promoting and preserving wider freedom of choice, and removes a hindrance or obstruction to the right of selection, I concur in the holding that this provision is discriminatory and void. But the limitation as to 500 signatures only applies to judges of the supreme court. No such provision is made as to other candidates, and this single provision certainly was not the inducement for the passage of the act. As to all other officers the majority opinion condemns the act upon one ground alone, that of the empty and forceless inhibition of free speech. I am firmly convinced that this alone is mere redundant matter, and is not of sufficient importance to justify setting the law aside.

This brings me to the question of what effect on the whole law is had by excising both of these provisions. It is a fundamental and elementary proposition that under our system of government what laws shall be passed, what political or governmental policy pursued, or what economic theory adopted in the affairs of government are matters with which the legislature is alone concerned, and for which it is alone responsible to the people of the state. It may be as well to say in this connection that whether the act was passed by a bare majority or whether it was unanimously adopted, whether the policy is new or whether ancient, whether its intent is wise or whether unwise, whether passed from partisan motives or not, and whether the result may prove to be good or evil are matters with which the court has no concern. Many laws, in fact most of great importance, have a partisan origin, and are obnoxious to many persons; but with this we have nothing to do.

Does the law, or do any of its provisions, violate the constitution? This is the sole question. If any portion of the act does so, is that portion such an essential and necessary element that its elimination leaves a law incomplete and fragmentary, and which does not accord with the legislative purpose and intent, and which is in-

capable of enforcement? It is the duty of the court to construe and interpret acts passed by the legislature so as to uphold them if their language reasonably admits of such interpretation, and not to set them aside unless they clearly contravene the constitutional limitations upon legislative power. All doubts must be resolved in favor of the statute, and all presumptions are that the legislature passed a valid act and kept within its constitutional powers. As a corollary, if a part of a statute fails as being obnoxious to the limitations of that instrument, if, after the elimination of the objectionable part, enough of the law remains so that the intention of the legislature may be carried out, and the desired end and purpose of the enactment accomplished, the act may stand. These propositions are so elementary that citation of authorities is needless; and, indeed, these are the canons recognized in the majority opinion. I agree with the language of Judge HOLCOMB, quoted in the majority opinion, that "the language found in the invalid portion of the act can have no legal force or efficacy for any purpose whatever (*State v. Insurance Co.*, 71 Neb. 335)," and with the language of the majority opinion that "what remains must express the legislative will, independently of the void part, since the court has no power to legislate." Tested by this rule, does "what remains express the legislative will?" I am convinced that there is no difficulty with the law in this respect. After eliminating the prohibition of free speech and the provision limiting the number of signatures for the office of supreme judge, we find an act which, in substance, provides that candidates for judicial and educational offices shall be nominated by petition, and not at primary elections, prescribing the number of signatures to entitle the candidate to the printing of his name upon the official ballot, and providing that the names shall be printed thereon without party designation. I see no obstacle to the carrying out of these provisions.

I am of the opinion that since the entire control of the

printing of the official ballot has been placed in the hands of the public authorities, and since if any candidate should "be nominated, indorsed, recommended, censured, criticised, or referred to" by any political party or political convention, this could have no possible effect upon the printing of any name or party designation upon the official ballot, the declared end and purpose of the act—to remove the election of candidates for such offices from the domain of party politics—may be accomplished, so far as it may be done among a free people. The legislature cannot prevent free speech, but it can control and regulate the official ballot and the manner of selection of names of candidates to be printed thereon. It has the right to do so in such a manner as to remove, as far as it may consistent with constitutional rights, certain offices, or all offices, if it chooses, "from the domain of partisan politics," if in its judgment it believes it to be for the best interests of the state. It cannot abolish parties, nor prevent their formation, it cannot prevent the free and open discussion of the qualifications and fitness for office of candidates, either by newspapers, individuals or assemblages of citizens, whether in church, mass meeting or political convention; but it has the undoubted right to mitigate, if it can, any evils that it believes to flow from nominations by political parties, so long as it acts in such a manner that there shall be no infringment upon the requirement of the constitution (art. I, sec. 22) that "all elections shall be free; and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise."

I believe that, with the excision of the immaterial and unessential provisions mentioned, the law is still in accordance with the legislative purpose and intent, and with the constitution of the state; that these portions may be declared invalid, and the remainder of the statute upheld as a valid exercise of legislative power. For these reasons, I must dissent from the conclusion reached that the law is altogether void.