## MacDOUGALL et al. v. GREEN, GOVERNOR OF ILLINOIS, et al.

No. 348.   Argued October 18, 1948.—Decided October 21, 1948.

*John J. Abt* and *Richard F. Watt* argued the cause for appellants.   With them on the brief were *Earl B. Dickerson* and *Edmund Hatfield*.

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for Green, Governor, et al., appellees. With him on the brief were *George F. Barrett,* Attorney General, and *Raymond S. Sarnow,* Assistant Attorney General.

*Melvin F. Wingersky* argued the cause for Flynn, County Clerk, et al., appellees. With him on the brief was *Gordon B. Nash.*

PER CURIAM.

This action was brought before a three-judge court convened in the Northern District of Illinois under 28 U. S. C. § 2281 and § 2284. The object of the action is an injunction against the enforcement of a provision which, in 1935, was added to a statute of Illinois and which requires that a petition to form and to nominate candidates for a new political party be signed by at least 25,000 qualified voters, "Provided, that included in the aggregate total of twenty-five thousand (25,000) signatures are the signatures of two hundred (200) qualified voters from each of at least fifty (50) counties within the State." Ill. Rev. Stat. c. 46, § 10—2 (1947). Appellants are the "Progressive Party," its nominees for United States Senator, Presidential Electors, and State offices, and several Illinois voters. Appellees are the Governor, the Auditor of Public Accounts, and the Secretary of State of Illinois, members of the Boards of Election Commissioners of various cities, and the County Clerks of various counties. The District Court found want of jurisdiction and denied the injunction. 80 F. Supp. 725. Appellants invoke the jurisdiction of this Court under 28 U. S. C. § 1253.

The action arises from the finding of the State Officers Electoral Board that appellants had not obtained the requisite number of signatures from the requisite number

of counties and its consequent ruling that their nominating petition was "not sufficient in law to entitle the said candidates' names to appear on the ballot." The appellants' claim to equitable relief against this ruling is based upon the peculiar distribution of population among Illinois' 102 counties. They allege that 52% of the State's registered voters are residents of Cook County alone, 87% are residents of the 49 most populous counties, and only 13% reside in the 53 least populous counties. Under these circumstances, they say, the Illinois statute is so discriminatory in its application as to amount to a violation of the due-process, equal-protection, and privileges-and-immunities clauses of the Fourteenth Amendment, as well as Article I, §§ 2 and 4, Article II, § 1, and the Seventeenth Amendment of the Constitution of the United States.

It is clear that the requirement of two hundred signatures from at least fifty counties gives to the voters of the less populous counties of Illinois the power completely to block the nomination of candidates whose support is confined to geographically limited areas. But the State is entitled to deem this power not disproportionate: of 25,000 signatures required, only 9,800, or 39%, need be distributed; the remaining 61% may be obtained from a single county. And Cook County, the largest, contains not more than 52% of the State's voters. It is allowable State policy to require that candidates for state-wide office should have support not limited to a concentrated locality. This is not a unique policy. See New York Laws 1896, c. 909, § 57, now N. Y. Elec. Law § 137 (4); 113 Laws of Ohio 349, Gen. Code § 4785–91 (1929), now Ohio Code Ann. (Cum. Supp. 1947) § 4785–91; Mass. Acts, 1943, c. 334, § 2, now Mass. Ann. Laws c. 53, § 6 (1945). To assume that political power is a function exclusively of numbers is to disregard the practicalities of government. Thus, the Constitution protects the interests of the

smaller against the greater by giving in the Senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States. *Colegrove* v. *Green,* 328 U. S. 549, and *Colegrove* v. *Barrett,* 330 U. S. 804.

On the record before us, we need not pass upon purely local questions, also urged by appellants, having no federal constitutional aspect.

*Judgment affirmed.*

MR. JUSTICE RUTLEDGE.

In its facts and legal issues this case is closely analogous to *Colegrove* v. *Green,* 328 U. S. 549. It presents serious constitutional questions crucial to the validity of Illinois election procedures and their application to the imminently impending general election. That a bare majority of this Court resolve them one way and three others hold opposing views only emphasizes their substantial character and supreme importance. These qualities are not diminished by the fact that the Attorney General of Illinois, appearing for the three members of the so-called "State Certifying Board," [1] has conceded in his brief the

---

[1] The State Certifying Board is composed of the Governor, the Auditor of Public Accounts and the Secretary of State, and petitions for the formation of new state-wide political parties are filed with this board. (Ill. Rev. Stat. c. 46 [1947] §§ 10—2, 10—4.) On the filing of timely objection to such petitions, the certifying board

validity of appellants' position and at the bar of this
Court has confessed error in the decision of the District
Court. Nor is it insignificant or irrelevant that the appli-
cation of the statutory procedures made by the state offi-
cials in practical effect denies to a substantial body of
qualified voters the right to exercise their suffrage in
behalf of candidates of their choice.

Forced by the exigencies of their situation, appellants
have invoked federal equity jurisdiction in vindication of
their rights. They seek injunctive relief, in effect, to com-
pel placing the names of their candidates upon the ballot
for the general election to be held on November 2. For
present purposes we may assume that appellants have
acted with all possible dispatch. Even so, we find our-
selves confronted on the eve of the election with the
alternatives of denying the relief sought or of directing
the issuance of an injunction.

This choice, in my opinion, presents the crucial question
and the only one necessarily or properly now to be de-
cided. Beyond the constitutional questions it poses deli-
cate problems concerning the propriety of granting the
relief in the prevailing circumstances. Even if we assume
that appellants' constitutional rights have been violated,
the questions arise whether, in those circumstances, the
equity arm of the federal courts can now be extended to

transmits the petitions and the objections to the State Officers Elec-
toral Board, which is not a party to this action. After passing
on the objection, the State Officers Electoral Board informs the State
Certifying Board of its ruling, and the certifying board is required
to "abide by and comply with the ruling so made to all intents and
purposes." (Ill. Rev. Stat. c. 46 [1947] § 10—10.) Where objection
is not made, or where it is made and overruled, the new party and
the names of its candidates are certified by the State Certifying Board
to the several county clerks; the clerks or the local boards of election
commissioners, both groups being parties to this action, thereupon
are required to print ballots containing the names of the candidates
thus certified. (Ill. Rev. Stat. c. 46 [1947] § 10—14.)

give effective relief; and whether the relief, if given, might not do more harm than good, might not indeed either disrupt the Illinois election altogether or disfranchise more persons than have been disfranchised by the application of the questioned Illinois procedures.

Every reason existing in *Colegrove* v. *Green, supra,* which seemed to me compelling to require this Court to decline to exercise its equity jurisdiction and to decide the constitutional questions is present here. See the opinion concurring in the result, 328 U. S. at 564. Indeed the circumstances are more exigent and therefore more compelling to that conclusion.

We are on the eve of the national election. But twelve days remain. Necessarily some of these would be consumed in remanding the cause to the District Court and in its consideration, formulation and issuance of an injunction in essentially specific terms. The ballots, as certified by the state officials, are in process of printing and distribution. Absentee ballots have been distributed. Illinois is one of the more populous states. Millions of ballots will be required, not only in the state but in Cook County alone. It is true that, on the short record before us and in the necessarily brief time available for preparing both the record and the briefs, appellees who oppose granting the relief have not made an absolutely conclusive factual showing that new ballots, containing the names of appellants' candidates, could not possibly be printed and distributed for use at the election. But they suggest with good reason that this could not be done. The task would be gigantic. Even with the mobilization of every possible resource, it is gravely doubtful that it could be accomplished. The risk would be very large that it could not be done. Even if it could for all except absentee voters, they would be disfranchised. Issuance of the injunction sought would invalidate the ballots

already prepared, including the absentee ballots, and those now in course of preparation.

The sum of these considerations, without regard to others not now necessary to state, forces me to conclude that the relief sought could be had at this late stage in the electoral process only at the gravest risk of disrupting that process completely in Illinois or of disfranchising Illinois voters in perhaps much greater numbers than those whose interests appellants represent. That is a risk which, in my judgment, federal courts of equity should not undertake and indeed are not free to undertake within the historic limits of their equity jurisdiction.

Accordingly, I express no opinion concerning the constitutional and other questions presented. As in *Colegrove* v. *Green, supra,* I think the case is one in which, for the reasons stated, this Court may properly, and should, decline to exercise its jurisdiction in equity. Accordingly, but solely for this reason, I agree that the judgment refusing injunctive relief should be affirmed.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE MURPHY concur, dissenting.

I think that the 1935 amendment of the Illinois Election Code, Ill. Rev. Stat. c. 46, § 10–2 (1947), as construed and applied in this case, violates the Equal Protection Clause of the Fourteenth Amendment.

That statute requires the nominating petition of a new political party, which places candidates on the ballot for the general election, to contain 200 signatures from each of at least 50 of the 102 counties in the state. The statute does not attempt to make the required signatures proportionate to the population of each county. One effect of this requirement is that the electorate in 49 of the counties which contain 87% of the registered voters could not form a new political party and place its candidates on

the ballot. Twenty-five thousand of the remaining 13% of registered voters, however, properly distributed among the 53 remaining counties could form a new party to elect candidates to office. That regulation thus discriminates against the residents of the populous counties of the state in favor of rural sections. It therefore lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment.

Free and honest elections are the very foundation of our republican form of government. We are dealing here with important political rights of the people—the voting for electors provided by Article II, § 1, of the Constitution; the right of the people to elect senators, guaranteed by the Seventeenth Amendment; the right of the people to choose their representatives in Congress, guaranteed by Article I, § 2, of the Constitution. Discrimination against any group or class of citizens in the exercise of these constitutionally protected rights of citizenship deprives the electoral process of integrity. The protection which the Constitution gives voting rights covers not only the general election but also extends to every integral part of the electoral process, including primaries. *United States* v. *Classic,* 313 U. S. 299; *Smith* v. *Allwright,* 321 U. S. 649. When candidates are chosen for the general election by a nominating petition, that procedure also becomes an integral part of the electoral process. It is entitled to the same protection as that which the Fourteenth Amendment grants any other part.

None would deny that a state law giving some citizens twice the vote of other citizens in either the primary or general election would lack that equality which the Fourteenth Amendment guarantees. See *Nixon* v. *Herndon,* 273 U. S. 536. The dilution of political rights may be as complete and effective if the same discrimination appears in the procedure prescribed for nominating petitions. See *State* v. *Junkin,* 85 Neb. 1, 122 N. W. 473.

It would, of course, be palpably discriminatory in violation of the Equal Protection Clause if this law were aimed at the Progressive Party in the manner that the state law in *Nixon* v. *Herndon, supra,* was aimed at negroes. But the effect of a state law may bring it under the condemnation of the Equal Protection Clause however innocent its purpose. It is invalid if discrimination is apparent in its operation. The test is whether it has some foundation in experience, practicality, or necessity. See *Skinner* v. *Oklahoma,* 316 U. S. 535, 541–542.

It is not enough to say that this law can stand that test because it is designed to require statewide support for the launching of a new political party rather than support from a few localities. There is no attempt here, as I have said, to make the required signatures even approximately proportionate to the distribution of voters among the various counties of the state. No such proportionate allocation could of course be mathematically exact. Nor would it be required. But when, as here, the law applies a rigid, arbitrary formula to sparsely settled counties and populous counties alike, it offers no basis whatever to justify giving greater weight to the individual votes of one group of citizens than to those of another group. This legislation therefore has the same inherent infirmity as that which some of us saw in *Colegrove* v. *Green,* 328 U. S. 549, 569. The fact that the Constitution itself sanctions inequalities in some phases of our political system[1] does not justify us in allowing a state to create

---

[1] The Federalist No. 62 explained the equality of representation of the States in the Senate as follows:

"If indeed it be right, that among a people thoroughly incorporated into one nation, every district ought to have a *proportional* share in the government, and that among independent and sovereign States, bound together by a simple league, the parties, however unequal in size, ought to have an *equal* share in the common councils, it does not appear to be without some reason that in a compound

additional ones.   The theme of the Constitution is equality among citizens in the exercise of their political rights. The notion that one group can be granted greater voting strength than another is hostile to our standards for popular representative government.

Federal courts should be most hesitant to use the injunction in state elections.   See *Wilson* v. *North Carolina,* 169 U. S. 586, 596.   If federal courts undertook the role of superintendence, disruption of the whole electoral process might result, and the elective system that is vital to our government might be paralyzed.   Cf. *Johnson* v. *Stevenson,* 170 F. 2d 108.   The equity court, moreover, must always be alert in the exercise of its discretion to make sure that its decree will not be a futile and ineffective thing.   But the case, as made before us, does not indicate that either of those considerations should deter us in striking down this unconstitutional statute and in freeing the impending Illinois election of its impediments. The state officials who are responsible for the election and who at this bar confessed error in the decision of the

---

republic, partaking both of the national and federal character, the government ought to be founded on a mixture of the principles of proportional and equal representation.

.           .           .           .           .

"the equal vote allowed to each State is at once a constitutional recognition of the portion of sovereignty remaining in the individual States, and an instrument for preserving that residuary sovereignty. So far the equality ought to be no less acceptable to the large than to the small States; since they are not less solicitous to guard, by every possible expedient, against an improper consolidation of the States into one simple republic.

"Another advantage accruing from this ingredient in the constitution of the Senate is, the additional impediment it must prove against improper acts of legislation.   No law or resolution can now be passed without the concurrence, first, of a majority of the people, and then, of a majority of the States."

District Court make no such intimation or suggestion. We are therefore not authorized to assume that our decree would interfere with the orderly process of the election.