GRAY, CHAIRMAN OF THE GEORGIA STATE
DEMOCRATIC EXECUTIVE COMMITTEE,
ET AL. *v.* SANDERS.

No. 112.   Argued January 17, 1963.—Decided March 18, 1963.

*B. D. Murphy* and *E. Freeman Leverett,* Deputy Assistant Attorneys General of Georgia, argued the cause for appellants. With them on the brief were *Eugene Cook,* Attorney General, and *Lamar W. Sizemore.*

*Morris B. Abram* argued the cause for appellee. With him on the brief were *Herman Heyman* and *Robert E. Hicks.*

*Attorney General Kennedy,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging affirmance. On the brief were *Solicitor General Cox, Assistant Attorney General Marshall, Bruce J. Terris, Harold H. Greene, David Rubin* and *Howard A. Glickstein.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

I.

This suit was instituted by appellee, who is qualified to vote in primary and general elections in Fulton County, Georgia, to restrain appellants from using Georgia's county unit system as a basis for counting votes in a Democratic primary for the nomination of a United States Senator and statewide officers, and for declaratory relief. Appellants are the Chairman and Secretary of the Georgia State Democratic Executive Committee, and the Secretary of State of Georgia. Appellee alleges that the use of the county unit system in counting, tabulating, consolidating, and certifying votes cast in primary elections for statewide offices violates the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment and the Seventeenth Amendment. As the constitutionality of a state statute was involved and the question was a substantial one, a three-judge court was properly convened. See 28 U. S. C. § 2281; *United States* v. *Georgia Public Service Comm'n,* 371 U. S. 285.

Appellants moved to dismiss; and they also filed an answer denying that the county unit system was unconstitutional and alleging that it was designed "to achieve a reasonable balance as between urban and rural electoral power."

Under Georgia law each county is given a specified number of representatives in the lower House of the Gen-

eral Assembly.[1] This county unit system at the time this suit was filed was employed as follows in statewide primaries:[2] (1) Candidates for nominations who received the highest number of popular votes in a county were considered to have carried the county and to be entitled to two votes for each representative to which the county is entitled in the lower House of the General Assembly; (2) the majority of the county unit vote nominated a United States Senator and Governor; the plurality of the county unit vote nominated the others.

Appellee asserted that the total population of Georgia in 1960 was 3,943,116; that the population of Fulton County, where he resides, was 556,326; that the residents of Fulton County comprised 14.11% of Georgia's total population; but that, under the county unit system, the six unit votes of Fulton County constituted 1.46% of the total of 410 unit votes, or one-tenth of Fulton County's percentage of statewide population. The complaint further alleged that Echols County, the least populous county in Georgia, had a population in 1960 of 1,876, or .05% of the State's population, but the unit vote of Echols County was .48% of the total unit vote of all counties in Georgia, or 10 times Echols County's statewide percentage of population. One unit vote in Echols County represented 938 residents, whereas one unit vote in Fulton County represented 92,721 residents. Thus, one resident in Echols County had an influence in the nomination of candidates equivalent to 99 residents of Fulton County.

---

[1] Ga. Const., 1945, Art. III, § III, ¶ I:

"The House of Representatives shall consist of representatives apportioned among the several counties of the State as follows: To the eight counties having the largest population, three representatives each; to the thirty counties having the next largest population, two representatives each; and to the remaining counties, one representative each."

[2] Ga. Code Ann., §§ 34–3212, 34–3213 (1936).

On the same day as the hearing in the District Court, Georgia amended the statutes challenged in the complaint. This amendment [3] modified the county unit system by allocating units to counties in accordance with a "bracket system" instead of doubling the number of representatives of each county in the lower House of the Georgia Assembly. Counties with from 0 to 15,000 people were allotted two units; an additional one unit was allotted for the next 5,000 persons; an additional unit for the next 10,000 persons; another unit for each of the next two brackets of 15,000 persons; and, thereafter, two more units for each increase of 30,000 persons. Under the amended Act, all candidates for statewide office (not merely for Senator and Governor as under the earlier Act) are required to receive a majority of the county unit votes to be entitled to nomination in the first primary. In addition, in order to be nominated in the first primary, a candidate has to receive a majority of the popular votes unless there are only two candidates for the nomination and each receives an equal number of unit votes, in which event the candidate with the popular majority wins. If no candidate receives both a majority of the unit votes and a majority of the popular votes, a second run-off primary is required between the candidate receiving the highest number of unit votes and the candidate receiving the highest number of popular votes. In the second primary, the candidate receiving the highest number of unit votes is to prevail. But again, if there is a tie in unit votes, the candidate with the popular majority wins.

Appellee was allowed to amend his complaint so as to challenge the amended Act. The District Court held that the amended Act had some of the vices of the prior Act. It stated that under the amended Act "the vote of

---

[3] Ga. Laws 1962, Ex. Sess., No. 1, p. 1217; Ga. Code Ann., §§ 34-3212, 34-3213 (1962).

each citizen counts for less and less as the population of the county of his residence increases." 203 F. Supp. 158, 170, n. 10. It went on to say:

"There are 97 two-unit counties, totalling 194 unit votes, and 22 counties totalling 66 unit votes, altogether 260 unit votes, within 14 of a majority; but no county in the above has as much as 20,000 population. The remaining 40 counties range in population from 20,481 to 556,326, but they control altogether only 287 county unit votes. Combination of the units from the counties having the smallest population gives counties having population of one-third of the total in the state a clear majority of county units." *Ibid.*

The District Court held that as a result of *Baker* v. *Carr,* 369 U. S. 186, it had jurisdiction, that a justiciable case was stated, that appellee had standing, and that the Democratic primary in Georgia is "state" action within the meaning of the Fourteenth Amendment. It held that the county unit system as applied violates the Equal Protection Clause, and it issued an injunction,[4] not against conducting any party primary election under the county unit system, but against conducting such an election under a county unit system that does not meet the requirements specified by the court.[5] 203 F. Supp.

---

[4] The order, dated April 28, 1962, was not restricted to the party primary of September 12, 1962; nor was the relief asked so restricted.

[5] The District Court in its order defined the type of county unit system which violated the Equal Protection Clause as follows:

"A county unit system for use in a party primary is invidiously discriminatory if any unit has less than its share to the nearest whole number proportionate to population, or to the whole of the vote in a recent party gubernatorial primary, or to the vote for electors of the party in the most recent presidential election; provided, no discrimination is deemed to be invidious under such system if the disparity against any county is not in excess of the disparity

158. In other words, the District Court did not proceed on the basis that in a statewide election every qualified person was entitled to one vote and that all weighted voting was outlawed. Rather, it allowed a county unit system to be used in weighting the votes if the system showed no greater disparity against a county than exists against any State in the conduct of national elections.[6] Thereafter the Democratic Committee voted to hold the 1962 primary election for the statewide offices mentioned on a popular vote basis. We noted probable jurisdiction. 370 U. S. 921.

## II.

We agree with the District Court that the action of this party in the conduct of its primary constitutes state action within the meaning of the Fourteenth Amendment. Judge Sibley, writing for the court in *Chapman* v. *King*, 154 F. 2d 460, showed with meticulous detail the manner in which Georgia regulates the conduct of party primaries (*id.*, pp. 463–464) and he concluded:

> "We think these provisions show that the State, through the managers it requires, collaborates in the conduct of the primary, and puts its power behind the rules of the party. It adopts the primary as a part of the public election machinery. The exclusions of voters made by the party by the primary rules become exclusions enforced by the State." *Id.*, p. 464.

We agree with that result and conclude that state regulation of this preliminary phase of the election process

---

that exists as against any state in the most recent electoral college allocation, or under the equal proportions formula for representation of the several states in the Congress of the United States, and, provided provision is made for allocations to be adjusted to accord with changes in the basis at least once each ten years."

[6] See note 5, *supra*.

makes it state action. See *United States* v. *Classic,* 313 U. S. 299; *Smith* v. *Allwright,* 321 U. S. 649.

We also agree that appellee, like any person whose right to vote is impaired (*Smith* v. *Allwright, supra; Baker* v. *Carr, supra,* pp. 204–208), has standing to sue.[7]

Moreover, we think the case is not moot by reason of the fact that the Democratic Committee voted to hold

---

[7] Chief Justice Holt stated over 250 years ago:

"A right that a man has to give his vote at the election of a person to represent him in parliament, there to concur to the making of laws, which are to bind his liberty and property, is a most transcendent thing, and of an high nature . . . . [I]t is a great injury to deprive . . . [him] of it. . . .

". . . It would look very strange, when the commons of *England* are so fond of their right of sending representatives to parliament, that it should be in the power of a sheriff, or other officer, to deprive them of that right, and yet that they should have no remedy . . . . This right of voting is a right in the plaintiff by the common law, and consequently he shall maintain an action for the obstruction of it. . . .

.        .        .        .        .

"But in the principal case my brother says, we cannot judge of this matter, because it is a parliamentary thing. O! by all means be very tender of that. Besides it is intricate, and there may be contrariety of opinions. . . . To allow this action will make publick officers more careful to observe the constitution of cities and boroughs, and not to be so partial as they commonly are in all elections, which is indeed a great and growing mischief, and tends to the prejudice of the peace of the nation. But they say, that this is a matter out of our jurisdiction, and we ought not to inlarge it. I agree we ought not to incroach or inlarge our jurisdiction; . . . but sure we may determine on a charter granted by the king, or on a matter of custom or prescription, when it comes before us without incroaching on the parliament. And if it be a matter within our jurisdiction, we are bound by our oaths to judge of it. This is a matter of property determinable before us. Was ever such a petition heard of in parliament, as that a man was hindered of giving his vote, and praying them to give him remedy? The parliament undoubtedly would say, take your remedy at law. It is not like the case of determining the right of election between the candidates." *Ashby* v. *White,* 2 Ld. Raym. 938, 953, 954, 956 (1702).

the 1962 primary on a popular vote basis. But for the injunction issued below, the 1962 Act remains in force; and if the complaint were dismissed it would govern future elections. In addition, the voluntary abandonment of a practice does not relieve a court of adjudicating its legality, particularly where the practice is deeply rooted and long standing. For if the case were dismissed as moot appellants would be "free to return to . . . [their] old ways." *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632.

## III.

On the merits we take a different view of the nature of the problem than did the District Court.

This case, unlike *Baker* v. *Carr, supra,* does not involve a question of the degree to which the Equal Protection Clause of the Fourteenth Amendment limits the authority of a State Legislature in designing the geographical districts from which representatives are chosen either for the State Legislature or for the Federal House of Representatives. Nor does it include the related problems of *Gomillion* v. *Lightfoot,* 364 U. S. 339, where "gerrymandering" was used to exclude a minority group from participation in municipal affairs. Nor does it present the question, inherent in the bicameral form of our Federal Government, whether a State may have one house chosen without regard to population. The District Court, however, analogized Georgia's use of the county unit system in determining the results of a statewide election to phases of our federal system. It pointed out that under the electoral college,[8] required by Art. II, § 1, of the Con-

---

[8] The electoral college was designed by men who did not want the election of the President to be left to the people. See S. Doc. No. 97, Survey of the Electoral College in the Political System of the United States, 79th Cong., 1st Sess. "George Washington was elected to the office of Chief Magistrate of the Nation, by 69 votes—the total num-

stitution and the Twelfth Amendment in the election of the President, voting strength "is not in exact proportion to population . . . . Recognizing that the electoral college was set up as a compromise to enable the formation of the Union among the several sovereign states, it still could hardly be said that such a system used in a state among its counties, assuming rationality and absence of arbitrariness in end result, could be termed invidious." 203 F. Supp., at 169.

Accordingly the District Court as already noted [9] held that use of the county unit system in counting the votes

ber cast by the electors. At that time, three States did not vote. New York had not yet passed an electoral law, and North Carolina and Rhode Island had not yet ratified the Constitution. Therefore, of an estimated population of 4,000,000 people, a President was chosen by 69 voters, who had not been selected by the people, but appointed by State legislatures, save in the instances of Maryland and Virginia." *Id.*, p. 4.

Hamilton expressed the philosophy behind the electoral college in The Federalist No. 68. "This process of election affords a moral certainty, that the office of president, will seldom fall to the lot of any man, who is not in an eminent degree endowed with the requisite qualifications. Talents for low intrigue and the little arts of popularity may alone suffice to elevate a man to the first honors in a single state; but it will require other talents and a different kind of merit to establish him in the esteem and confidence of the whole union, or of so considerable a portion of it as would be necessary to make him a successful candidate for the distinguished office of president of the United States. It will not be too strong to say, that there will be a constant probability of seeing the station filled by characters pre-eminent for ability and virtue. And this will be thought no inconsiderable recommendation of the constitution, by those, who are able to estimate the share, which the executive in every government must necessarily have in its good or ill administration."

Passage of the Fifteenth, Seventeenth, and Nineteenth Amendments shows that this conception of political equality belongs to a bygone day, and should not be considered in determining what the Equal Protection Clause of the Fourteenth Amendment requires in statewide elections.

[9] See note 5, *supra*.

in a statewide election was permissible "if the disparity against any county is not in excess of the disparity that exists against any state in the most recent electoral college allocation." 203 F. Supp., at 170. Moreover the District Court held that use of the county unit system in counting the votes in a statewide election was permissible "if the disparity against any county is not in excess of the disparity that exists . . . under the equal proportions formula for representation of the several states in the Congress." *Ibid.* The assumption implicit in these conclusions is that since equality is not inherent in the electoral college and since precise equality among blocs of votes in one State or in the several States when it comes to the election of members of the House of Representatives is never possible, precise equality is not necessary in statewide elections.

We think the analogies to the electoral college, to districting and redistricting, and to other phases of the problems of representation in state or federal legislatures or conventions [10] are inapposite. The inclusion of the electoral college in the Constitution, as the result of specific historical concerns,[11] validated the collegiate principle despite its inherent numerical inequality, but implied nothing about the use of an analogous system by a State in a statewide election. No such specific accommodation of the latter was ever undertaken, and therefore no validation of its numerical inequality ensued. Nor does the question here have anything to do with the composition of the state or federal legislature. And we intimate no opinion on the constitutional phases of that problem beyond what we said in *Baker* v. *Carr, supra.* The present case is only a voting case. Cf. *Nixon* v. *Herndon,* 273

---

[10] We do not reach here the questions that would be presented were the convention system used for nominating candidates in lieu of the primary system.

[11] See note 8, *supra.*

U. S. 536; *Nixon* v. *Condon,* 286 U. S. 73; *Smith* v. *All-wright, supra.* Georgia gives every qualified voter one vote in a statewide election; but in counting those votes she employs the county unit system which in end result weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties.

States can within limits specify the qualifications of voters in both state and federal elections; the Constitution indeed makes voters' qualifications rest on state law even in federal elections. Art. I, § 2. As we held in *Lassiter* v. *Northampton Election Board,* 360 U. S. 45, a State may if it chooses require voters to pass literacy tests, provided of course that literacy is not used as a cloak to discriminate against one class or group. But we need not determine all the limitations that are placed on this power of a State to determine the qualifications of voters, for appellee is a qualified voter.

The Fifteenth Amendment prohibits a State from denying or abridging a Negro's right to vote. The Nineteenth Amendment does the same for women. If a State in a statewide election weighted the male vote more heavily than the female vote or the white vote more heavily than the Negro vote; none could successfully contend that that discrimination was allowable. See *Terry* v. *Adams,* 345 U. S. 461. How then can one person be given twice or ten times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of

"we the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions.

The Court has consistently recognized that all qualified voters have a constitutionally protected right "to cast their ballots and have them counted at Congressional elections." *United States* v. *Classic,* 313 U. S. 299, 315; see *Ex parte Yarbrough,* 110 U. S. 651; *Wiley* v. *Sinkler,* 179 U. S. 58; *Swafford* v. *Templeton,* 185 U. S. 487. Every voter's vote is entitled to be counted once. It must be correctly counted and reported. As stated in *United States* v. *Mosley,* 238 U. S. 383, 386, "the right to have one's vote counted" has the same dignity as "the right to put a ballot in a box." It can be protected from the diluting effect of illegal ballots. *Ex parte Siebold,* 100 U. S. 371; *United States* v. *Saylor,* 322 U. S. 385. And these rights must be recognized in any preliminary election that in fact determines the true weight a vote will have. See *United States* v. *Classic, supra; Smith* v. *Allwright, supra.* The concept of political equality in the voting booth contained in the Fifteenth Amendment extends to all phases of state elections, see *Terry* v. *Adams, supra;* and, as previously noted, there is no indication in the Constitution that homesite or occupation affords a permissible basis for distinguishing between qualified voters within the State.

The only weighting of votes sanctioned by the Constitution concerns matters of representation, such as the allocation of Senators irrespective of population and the use of the electoral college in the choice of a President. Yet when Senators are chosen, the Seventeenth Amendment states the choice must be made "by the people." Minors, felons, and other classes may be excluded. See

*Lassiter* v. *Northampton Election Board, supra,* p. 51. But once the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded. As we stated in *Gomillion* v. *Lightfoot, supra,* p. 347:

> "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right."

The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.

While we agree with the District Court on most phases of the case and think it was right in enjoining the use of the county unit system [12] in tabulating the votes, we vacate its judgment and remand the case so that a decree in conformity with our opinion may be entered.

*It is so ordered.*

MR. JUSTICE STEWART, whom MR. JUSTICE CLARK joins, concurring.

In joining the opinion and judgment of the Court, I emphasize what—but for my Brother HARLAN's dissent—I should have thought would be apparent to all who read the Court's opinion. This case does not involve the

---

[12] The county unit system, even in its amended form (see note 3, *supra*) would allow the candidate winning the popular vote in the county to have the entire unit vote of that county. Hence the weighting of votes would continue, even if unit votes were allocated strictly in proportion to population. Thus if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded.

validity of a State's apportionment of geographic constituencies from which representatives to the State's legislative assembly are chosen, nor any of the problems under the Equal Protection Clause which such litigation would present. We do not deal here with "the basic ground rules implementing *Baker* v. *Carr*." This case, on the contrary, involves statewide elections of a United States Senator and of state executive and judicial officers responsible to a statewide constituency. Within a given constituency, there can be room for but a single constitutional rule—one voter, one vote. *United States* v. *Classic*, 313 U. S. 299.

MR. JUSTICE HARLAN, dissenting.

When *Baker* v. *Carr*, 369 U. S. 186, was argued at the last Term we were assured that if this Court would only remove the roadblocks of *Colegrove* v. *Green*, 328 U. S. 549, and its predecessors to judicial review in "electoral" cases, this Court in all likelihood would never have to get deeper into such matters. State legislatures, it was predicted, would be prodded into taking satisfactory action by the mere prospect of legal proceedings.

These predictions have not proved true. As of November 1, 1962, the apportionment of seats in at least 30 state legislatures had been challenged in state and federal courts,[1] and, besides this one, 10 electoral cases of one kind or another are already on this Court's docket.[2] The present case is the first of these to reach plenary consideration.

---

[1] Advisory Commission on Intergovernmental Relations, Report on Apportionment of State Legislatures, December 1962, p. A–21. I have been informed by the Administrative Office of the United States Courts that, by December 31, 1962, over 25 suits had been filed in the federal courts alone.

[2] No. 460, *WMCA, Inc.*, v. *Simon;* No. 507, *Wesberry* v. *Sanders;* No. 508, *Reynolds* v. *Sims;* No. 517, *Beadle* v. *Scholle;* No. 540, *Vann* v. *Frink;* No. 554, *Maryland Comm. for Fair Representation*

Preliminarily, it is symptomatic of the swift pace of current constitutional adjudication that the majority opinion should have failed to mention any of the four occasions on which Georgia's County Unit System has previously been unsuccessfully challenged in this Court. *Cook* v. *Fortson,* decided with *Turman* v. *Duckworth,* 329 U. S. 675 (1946); *South* v. *Peters,* 339 U. S. 276 (1950); *Cox* v. *Peters,* 342 U. S. 936 (1952); and *Hartsfield* v. *Sloan,* 357 U. S. 916 (1958).

It is true that none of these cases reached the stage of full plenary consideration but, in light of the judicial history recounted by Mr. Justice Frankfurter in his dissenting opinion in *Baker* v. *Carr, supra,* at 266, 278 *et seq.,* only the guileless could fail to recognize that the prevailing view then was that the validity of this County Unit System was not open to serious constitutional doubt.[3] This estimate of the earlier situation is highlighted by the dissenting opinion of JUSTICES BLACK and DOUGLAS in *South* v. *Peters, supra,* at 277, in which they unsuccessfully espoused the very views which now become the law. Presumably my two Brothers also reflected these same views in noting their dissents in the *Cox* and *Hartsfield* cases. See also *Cook* v. *Fortson,* etc., *supra,* in which MR. JUSTICE BLACK also noted his dissent.

But even if the Court's present silence about these cases can be deemed justified on the premise that their summary disposition can be satisfactorily accounted for on grounds not involving the merits, I consider today's decision not supportable.

---

v. *Tawes;* No. 610, *McConnell* v. *Frink;* No. 688, *Price* v. *Moss;* No. 689, *Oklahoma Farm Bureau* v. *Moss;* No. 797, *Davis* v. *Mann.*

[3] Although the Solicitor General, as *amicus,* suggests that the Court's action in *South* v. *Peters* rested simply on a refusal to exercise federal equity power, it should be noted that the first case cited in the Court's *per curiam* affirmance is *MacDougall* v. *Green,* 335 U. S. 281. See *infra,* p. 385.

In the context of a nominating primary respecting candidates for statewide office, the Court construes the Equal Protection Clause of the Fourteenth Amendment as requiring that each person's vote be given equal weight. The majority says: "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing— one person, one vote." *Ante,* p. 381. The Court then strikes down Georgia's County Unit System *as such,* a holding which the District Court declined to make. 203 F. Supp., at 170.

The Court's holding surely flies in the face of history. For, as impressively shown by the opinion of Frankfurter, J., in *Baker* v. *Carr* (369 U. S., at 301–324), "one person, one vote" has never been the universally accepted political philosophy in England, the American Colonies, or in the United States. The significance of this historical fact seems indeed to be recognized by the Court, for it implies that its new-found formula might not obtain in a case involving the apportionment of seats in the "State Legislature or for the Federal House of Representatives." *Ante,* p. 376.

But, independently of other reasons that will be discussed in a moment, any such distinction finds persuasive refutation in the Federal Electoral College whereby the President of the United States is chosen on principles wholly opposed to those now held constitutionally required in the electoral process for statewide office. One need not close his eyes to the circumstance that the Electoral College was born in compromise, nor take sides in the various attempts that have been made to change the system,[4] in order to agree with the court below that it "could

---

[4] See Wechsler, Presidential Elections and the Constitution: A Comment on Proposed Amendment, 35 A. B. A. J. 181 (1949).

hardly be said that such a system used in a state among its counties, assuming rationality and absence of arbitrariness in end result, could be termed invidious." 203 F. Supp., at 169.

Indeed this Court itself some 15 years ago rejected, in a comparable situation, the notion of political equality now pronounced. In *MacDougall* v. *Green,* 335 U. S. 281, challenge was made to an Illinois law requiring that nominating petitions of a new political party be signed by at least 25,000 voters, including a minimum of 200 voters from each of at least 50 of the 102 counties in the State. The claim was that the "200 requirement" made it possible for "the voters of the less populous counties . . . to block the nomination of candidates whose support is confined to geographically limited areas." *Id.,* at 283. In disallowing this claim, the Court said (*id.,* at 283–284):

> "To assume that political power is a function exclusively of numbers is to disregard the practicalities of government. Thus, the Constitution protects the interests of the smaller against the greater by giving in the Senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States."

Certainly no support for this equal protection doctrine can be drawn from the Fifteenth, Seventeenth, or

Nineteenth Amendment. The Fifteenth Amendment simply assures that the right to vote shall not be impaired "on account of race, color, or previous condition of servitude." The Seventeenth Amendment provides that Senators shall be "elected by the people," with no indication that all people must be accorded a vote of equal weight. The Nineteenth Amendment merely gives the vote to women. And it is hard to take seriously the argument that "dilution" of a vote in consequence of a legislatively sanctioned electoral system can, without more, be analogized to an impairment of the political franchise by ballot box stuffing or other criminal activity, *e. g., United States* v. *Mosley,* 238 U. S. 383, *United States* v. *Classic,* 313 U. S. 299, *United States* v. *Saylor,* 322 U. S. 385, or to the disenfranchisement of qualified voters on purely racial grounds, *Gomillion* v. *Lightfoot,* 364 U. S. 339.

A violation of the Equal Protection Clause thus cannot be found in the *mere* circumstance that the Georgia County Unit System results in disproportionate vote weighting. It "is important for this court to avoid extracting from the very general language of the Fourteenth Amendment a system of delusive exactness . . . ." *Louisville & Nashville R. Co.* v. *Barber Asphalt Co.,* 197 U. S. 430, 434 (Holmes, J.). What then remains of the equal protection claim in this case?

At the core of Georgia's diffusion of voting strength which favors the small as against the large counties is the urban-rural problem, so familiar in the American political scene. In my dissent in *Baker* v. *Carr,* 369 U. S., at 336, I expressed the view that a State might rationally conclude that its general welfare was best served by apportioning more seats in the legislature to agricultural communities than to urban centers, lest the legitimate interests of the former be submerged in the stronger electoral voice of the latter. In my opinion, recognition of the same factor cannot be deemed irrational in the present situation,

even though all of the considerations supporting its use in a legislative apportionment case are not present here.

Given the undeniably powerful influence of a state governor on law and policy making,[5] I do not see how it can be deemed irrational for a State to conclude that a candidate for such office should not be one whose choice lies with the numerically superior electoral strength of urban voters. By like token, I cannot consider it irrational for Georgia to apply its County Unit System to the selection of candidates for other statewide offices [6] in order to assure against a predominantly "city point of view" in the administration of the State's affairs.

On the existing record, this leaves the question of "irrationality" in this case to be judged on the basis of pure arithmetic. The Court by its "one person, one vote" theory in effect avoids facing up to that problem, but the District Court did face it, holding that the disparities in voting strength between the largest county (Fulton) and the four smallest counties (Webster, Glascock, Quitman, and Echols), running respectively 8 to 1, 10 to 1, 11 to 1,

---

[5] The Georgia Constitution vests in the Governor the State's "executive power," and authorizes him to recommend legislation, make reports to and call extraordinary sessions of the State General Assembly, issue writs of election to fill vacancies in the General Assembly, veto or approve bills and resolutions, and require reports from the various departments of the State. Ga. Const. of 1945, Art. V, §§ 2–3001 to 2–3017. Also, by statute, payments cannot be made from the state treasury without a warrant issued by the Governor, Ga. Code Ann., § 40–204, and in the event of a public emergency the Governor is authorized to promulgate and enforce such rules and regulations as are necessary to prevent, control, or quell violence, threatened or actual, Ga. Code Ann., § 40–213.

[6] Those involved in this case, besides Governor, are United States Senator, Lieutenant Governor, Secretary of State, Justice of the Supreme Court, Judge of the Court of Appeals, Attorney General, Comptroller General, Commissioner of Labor, and Treasurer. The Governor has a general power to fill vacancies in such offices, unless otherwise provided by law. Ga. Const. of 1945, Art. V, § 2–3013.

and 14 to 1 in favor of the latter,[7] were invidiously discriminatory. But it did not tell us why. I do not understand how, on the basis of these mere numbers, unilluminated as they are by any of the complex and subtle political factors involved, a court of law can say, except by judicial fiat, that these disparities are in themselves constitutionally invidious.

The disproportions in the Georgia County Unit System are indeed not greatly out of line with those existing under the Electoral College count for the Presidency. The disparity in population per Electoral College vote between New York (the largest State in the 1960 census) and Alaska (the smallest) was about 5 to 1.[8] There are only 15 Georgia counties, out of a total of 159, which have a greater disparity per unit vote, and of these 15 counties 4 have disparity of less than 6 to 1. It is thus apparent that a slight modification of the Georgia plan could bring it within the tolerance permitted in the federal scheme.

It was of course imponderables like these that lay at the root of the Court's steadfast pre-*Baker* v. *Carr* refusal "to enter [the] political thicket." *Colegrove* v. *Green, supra*, at 556. Having turned its back on this wise chapter in its history, the Court, in my view, can no longer escape the necessity of coming to grips with the thorny problems it so studiously strove to avoid in *Baker* v. *Carr*

---

[7]

| County | Population | Unit Vote | Population per Unit Vote | Ratio to Fulton County |
|---|---|---|---|---|
| Fulton ........... | 556,326 | 40 | 13,908 | |
| DeKalb ......... | 256,782 | 20 | 12,839 | |
| Chatham ........ | 188,299 | 16 | 11,760 | |
| Muscogee ....... | 158,623 | 14 | 11,330 | |
| Webster ......... | 3,247 | 2 | 1,623 | 8 to 1 |
| Glascock ........ | 2,672 | 2 | 1,336 | 10 to 1 |
| Quitman ........ | 2,432 | 2 | 1,216 | 11 to 1 |
| Echols .......... | 1,876 | 2 | 938 | 14 to 1 |

[8] Statistical Abstract of the United States 10, 366 (1962).

(see concurring opinion of STEWART, J., 369 U. S., at 265, and dissenting opinion of HARLAN, J., *id.*, at 339) and in two subsequent cases, *Scholle* v. *Hare,* 369 U. S. 429, 430 (concurring opinion of CLARK, J., and STEWART, J.), 430–435 (dissenting opinion of HARLAN, J.); *W. M. C. A., Inc.,* v. *Simon,* 370 U. S. 190, 191–194 (dissenting opinion of HARLAN, J.). To regard this case as being outside the general stream of electoral cases because only two other States, Maryland and Mississippi, have county unit systems, is to hide one's head in the sand.

What then should be the test of "rationality" in this judicially unfamiliar field? My Brother CLARK has perhaps given us a clue in the legislative inactivity—absence of any other remedy—crazy quilt approach contained in his concurring opinion in *Baker* v. *Carr, supra,* at 253–262. But I think a formulation of the basic ground rules in this untrod area of judicial competence should await a fully developed record. This case is here at an interlocutory stage. The temporary injunction before us issued upon a record consisting only of the pleadings, answers to interrogatories, affidavits, statistical material, and what the lower court described as a "liberal use of our right to take judicial notice of matters of common knowledge and public concern." 203 F. Supp., at 160, n. 1. No full-dress exploration of any of the many intricate questions involved in establishing criteria for judging "rationality" took place, the opinion and decree below issued the day following the hearing, and the District Court observed that, while its standards of equal protection (which this Court now puts aside) "may appear doctrinaire to some extent," it was constrained to act as it did because of the then (but no longer existing) [9] urgency of the situation. 203 F. Supp., at 170.

---

[9] Following the District Court's injunction, a statewide direct primary was held.

Surely, if the Court's "one person, one vote" ideology is constitutionally untenable, as I think it clearly is, the basic ground rules implementing *Baker* v. *Carr* should await the trial of this or some other case in which we have before us a fully developed record. Only then can we know what we are doing. Cf. *White Motor Co.* v. *United States, ante,* p. 253. A matter which so profoundly touches the barriers between federal judicial and state legislative authority demands nothing less.

I would vacate the judgment of the District Court and remand the case for trial.