**Max B. GOLDBLATT**

v.

**The CITY OF DALLAS.**

**No. CA–3–2159.**

United States District Court
N. D. Texas,
Dallas Division.

Jan. 26, 1968.

Joseph A. Devany, Dallas, Tex., for plaintiff.

N. Alex Bickley, Ted P. MacMaster and Jerry B. Williamson, H. P. Kucera, Dallas, Tex., for defendant.

Before GOLDBERG, Circuit Judge, and ESTES and HUGHES, District Judges.

ESTES, District Judge:

Plaintiff, Max B. Goldblatt, a qualified voter residing in Dallas and a candidate for City Councilman, Place 3, District C, in the April 4, 1967, City Council elections, in his Original Complaint demanded (1) that a preliminary injunction be issued by the three-judge court convened restraining the City of Dallas from enforcing the provisions of Section 21 of the Charter of the City of Dallas providing for at-large elections, with residence requirements for six of the nine councilmen; (2) a decree that Section 21 is unconstitutional and void in its application to plaintiff, in that it denies plaintiff and all citizens in his district equal protection of the law in violation of Section 1 of the Fourteenth Amendment to the Constitution of the United States; and (3) permanent injunction, after trial on the merits, restraining the City from holding future elections under Section 21.

It is uncontroverted that the City of Dallas is governed by a charter enacted in 1907, as a special Act of the Legisla-

ture of the State of Texas, Local and Special Laws of Texas 1907, c. 71. By a vote of the citizens of the City of Dallas, the Charter was amended in a city-wide election held in October, 1930. At this election, the voters adopted the council-manager form of government and Sections 19, 20, and 21 governing elections. These sections of the Charter provide that there shall be nine councilmen; that the City is divided into six districts ("as nearly equal in population as is practicable," which will be rearranged "not oftener than once each two years" to keep the populations of each district as equal as practicable) known as Districts A, B, C, D, E, and F; that the council candidates for six Places, numbered 1, 2, 3, 4, 5, and 6, shall reside in Districts A, B, C, D, E, and F, respectively; and that candidates for the remaining three Places, numbered 7, 8, and 9, may reside in any portion of the City.

Section 21 of the Charter provides, in pertinent part:

"All members of the City Council shall be elected by a vote of the qualified voters of the City of Dallas at large. All qualified voters in the city shall be entitled to vote for candidates for each place number. The candidate for Councilman receiving a majority of all votes cast as provided in Section 20 hereof, for the position of Councilman under the place number under which his name appears shall be declared the duly elected Councilman to hold said position."

The results of the election on April 4, 1967, regarding plaintiff's race for Place 3, District C, disclose that he lost city-wide by a vote of 14,429 to 9,009, but he was the choice of the voters in his District C by a vote of 2,192 to 1,287. The six districts of the City of Dallas were populated, as of 1964, as follows:

| District A | 139,349 |
| District B | 140,221 |
| District C | 138,288 |
| District D | 139,138 |
| District E | 137,235 |
| District F | 135,184 |

In 1967, there was substantial equality of population among the six districts—"approximately 140,000 persons" in each district.

At this point, the plaintiff would have been entitled to no relief under the decisions of the Supreme Court in Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L. Ed.2d 401 (1965), and Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967).[1]

Plaintiff then amended his complaint by adding the further allegation:

"That the present plan of electing City Councilmen pursuant to said Section 21 of the Charter of The City of Dallas has resulted in a scheme to perpetuate and preserve control of the City Council of the City of Dallas by a group known as the Citizens Charter Association."

Plaintiff argues that "the Dallas election law does not pass constitutional muster because the people are effectively denied representation by an invidious discrimination against their choices."

Both plaintiff and defendant filed motions for summary judgment.

In accordance with pretrial orders and directions made and given at pretrial conferences on December 7, 1967, and January 23, 1968, plaintiff made and filed a full and complete offer of proof of the facts he expected to prove, entitled "Plaintiff's List of Witnesses" and

---

1. Indeed, under Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967), a three-judge court was not authorized under 28 U.S.C. § 2281 to determine this matter. The Supreme Court's opinion stated that a three-judge court is properly convened "only when a state statute of general and state-wide application is sought to be enjoined" and "the fact that the charter was enacted into law does not change the result." 387 U.S. 101–103. 87 S.Ct. 1548–1549. To the same effect, Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967).

"Facts to be Developed from the Foregoing Listed Witnesses." Thereupon, "Defendant's Answer to Plaintiff's List of Witnesses and Offered Testimony" was filed, denying the matters contained in plaintiff's offer of proof.

Plaintiff asserts that his offer of proof shows "controlling majorities in all but two of the nineteen city administrations since 1931, the date Section 21 was adopted, have been nominated and elected by the Citizens Charter Association," and that such offer of proof shows that since 1939 "in * * * fifteen elections, * * 135 CCA candidates [have] run against 210 independents with the CCA candidates consistently winning control of the Council. In that time only 4 of the 210 independents were successful."

Plaintiff's offer of proof also includes a variety of charges, conclusions and color words which, in our opinion, are irrelevant and immaterial to the issue of whether Section 21 of the City Charter meets the constitutional test of "invidious discrimination" involved in this action.[2]

At the pretrial conference on January 23, 1968, with the consent of counsel, the Court heard and considered the motions of both parties for summary judgment and determined from the pleadings, stipulations of the parties, and offers of proof by both parties that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law; that plaintiff's motion for summary judgment should be denied; and that defendant's motion for summary judgment should be granted.

In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (regarding elections of state legislators), the Supreme Court formulated the constitutional test under the Equal Protection Clause applicable to cases involving the principle of one-person-one-vote, of whether there is an "invidious discrim-

ination." Mr. Chief Justice Warren's opinion states:

"Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests.

* * * * * *

[T]he democratic ideals of equality and majority rule, which have served this Nation so well in the past, are hardly of any less significance for the present and the future." At 562 and 566, 84 S.Ct. at 1382 and 1384.

The opinion, at 557, 84 S.Ct. at 1379, quotes from Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 9 L.Ed.2d 821:

"Once the geographical unit for which a representative is to be chosen is designated [here, the City of Dallas], all who participate in the election are to have an equal vote—whatever their race, * * * occupation, * * * income, and wherever their home may be in that geographical unit."

The *Reynolds* opinion continues:

"Political subdivisions of States— counties, cities, or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions. As stated by the Court in Hunter v. City of Pittsburgh, 207 U.S. 161, 178 [28 S.Ct. 40, 46, 52 L.Ed. 151], these governmental units are 'created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them,' and the 'number, nature, and duration of the powers conferred upon [them] * * * and the territory over which they shall be exercised rests in the absolute discretion of the State.'" 377 U.S. at 575, 84 S.Ct. at 1388.

In Fortson v. Dorsey, 379 U.S. 433, 438, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965), which upheld a residence require-

2. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

ment for the election of state senators from a multi-district county, Mr. Justice Brennan's opinion states:

"   *   *   *   It is not accurate to treat a senator from a multi-district county as the representative of only that district within the county wherein he resides.   The statute uses districts in multi-district counties merely as the basis of residence for candidates, not for voting or representation.   Each district's senator must be a resident of that district, but since his tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people in the county, and not merely those of people in his home district; thus in fact he is the county's and not merely the district's senator. *   *   *   "

The decision in Dusch v. Davis, supra, upheld an election plan specifically analogous to the Dallas six-three election plan, except that the boroughs in the City of Virginia Beach "Seven-Four Plan" vary widely (from 733 to 29,048) in population, while in Dallas the populations of the six districts are substantially the same.   The opinion of the Court, delivered by Mr. Justice Douglas, quotes from Mr. Justice Brennan's opinion in *Fortson* and says:

"By analogy the present consolidation plan uses boroughs in the city 'merely as the basis of residence for candidates, not for voting or representation.'   He is nonetheless the city's, not the borough's councilman.   In *Fortson* there was substantial equality of population in the senatorial districts, while here the population of the boroughs varies widely.   If a borough's resident on the council represented in fact only the borough, residence being only a front, different conclusions might follow.   But on the assumption that Reynolds v. Sims controls, the constitutional test under the Equal Protection Clause is whether there is an 'invidious' discrimination."   387 U.S. at 115–116, 87 S.Ct. at 1556.

In *Dusch*, the Court had before it the memorandum opinion of the District

Court, which noted that in the Democratic primary

"Opposition existed in only one borough where the defeated candidate, having declared for election from that borough, secured more votes in the particular borough of his residence than the successful candidate *   *   *."

Mr. Justice Douglas' opinion noted that, "It is obvious that, if the percentage of qualified voters is in accord with the population, Lynnhaven and Bayside, if united in their efforts, could elect all 11 councilmen even though the election were at large."   The Court quotes from the Memorandum of the District Court:

"The 'Seven-Four Plan' is not an evasive scheme to avoid the consequences of reapportionment or to perpetuate certain persons in office.   The plan does not preserve any controlling influence of the smaller boroughs, but does indicate a desire for intelligent expression of views on subjects relating to agriculture which remains a great economic factor in the welfare of the entire population."   Id. at 116–117, 87 S.Ct. at 1556.

The opinion in Dusch v. Davis, supra, concludes that:

"The Seven-Four Plan seems to reflect a detente between urban and rural communities that may be important in resolving the complex problems of the modern megalopolis in relation to the city, the suburbia, and the rural countryside.   Finding no invidious discrimination we conclude that the judgment of the Court of Appeals must be and is *Reversed*."   387 U.S. at 117, 87 S.Ct. at 1556.

In Wesberry v. Sanders, 376 U.S. 1, 7–8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964), the Court stated:

"We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable *one man's vote in a congressional election is to be worth as much as another's.   This rule is followed auto-*

*matically * * * when Representatives are chosen as a group on a statewide basis,* as was a widespread practice in the first 50 years of our Nation's history. * * * " [Emphasis supplied]

In Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), the Court says:

" * * * Where the requirements of Reynolds v. Sims are met, apportionment schemes including multimember districts will constitute an invidious discrimination only if it can be shown that 'designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' * * * " At 88, 86 S.Ct. at 1294.

In Burns v. Richardson, supra, Mr. Justice Stewart, concurring, states: " '[T]he Equal Protection Clause demands * * * that * * * the plan must be such as not to permit the systematic frustration of the will of a majority of the electorate of the State.' " At 99, 86 S.Ct. at 1300.

In Reed v. Mann, 237 F.Supp. 22 (N.D. Ga.1964), Circuit Judge Griffin Bell's opinion says:

" * * * And we know of no doctrine of law other than that of inequality on which a claim of denial of equal protection or due process under such circumstances can otherwise rest. There is no right *per se* to select representatives from any given size district or unit." At 24–25.

Under the Charter plan, "every voter in the [city] is treated equally." Id. at 24.

The *Reed* opinion continues:

"Whether the selection of commissioners is to be on a district or county wide basis is a matter, in the beginning, of political or governmental policy and judgment. * * * The selection of a system, so long as it is not proscribed by the federal Constitution, is, of course, not the business of the court." At 24.

And, in Baker v. Carr, 369 U.S. 186, 259–260, 82 S.Ct. 691, 733, 7 L.Ed.2d 663 (1962), Mr. Justice Clark states in his concurring opinion:

" * * * The federal courts are of course not forums for political debate, nor should they resolve themselves into state constitutional conventions or legislative assemblies. Nor should their jurisdiction be exercised in the hope that * * * a declaration * * * may have the direct effect of bringing on legislative action * * *."

"The [Six-Three] Plan [under attack] makes no distinction on the basis of race, creed, or economic status or location."[3] The election-at-large plan under Section 21 of the City Charter meets the constitutional test under the Equal Protection Clause of " 'invidious' discrimination"[4] and is valid.

It is, therefore, the Opinion, Order, and Judgment of the Court and of each of the Judges that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion for Summary Judgment be and it is hereby granted, to which action of the Court the plaintiff made due exception.

3. Dusch v. Davis, 387 U.S. at 115, 87 S.Ct. at 1555.

4. Id. at 116, 87 S.Ct. 1554.