No. 23045.

CECIL A. HARTMAN, ET AL *v.* THE CITY AND COUNTY OF DENVER, ET AL.

(440 P.2d 778)

Decided May 13, 1968.

Gᴇᴏʀɢᴇ Lᴏᴜɪs Cʀᴇᴀᴍᴇʀ, for plaintiffs in error.

MAX P. ZALL, BRIAN H. GORAL, THOMAS A. GILLIAM, for defendants in error in their official capacities: City and County of Denver Election Commission, F. J. Serafini, Doris Banks, John Rigg, City Council a/k/a Board of Councilmen, Robert Keating, Irving Hook, Paul Hentzell, Kenneth MacIntosh, Carl DeTemple, Elvin Caldwell, F. J. Serafini, as Clerk and Recorder, John F. Kelly, Edward S. Burke and Ernest Marranzino.

HENRY and KEATING, for defendants in error Robert Keating, Irving Hook, Paul Hentzell, Kenneth MacIntosh, Carl DeTemple, and Elvin Caldwell, in their individual capacities.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

THIS action for a declaratory judgment was commenced in the Denver district court three days after the May 16, 1967 Denver municipal election was held. Plaintiffs in error, whom we will designate as plaintiffs, are qualified electors of Denver, residing in either councilmanic districts 5 or 9. They requested the district court to declare City and County of Denver, Colo., Ordinance 127, Series 1967, null and void. This ordinance was enacted on April 17, 1967, modifying the then existing boundaries of Denver's nine councilmanic districts.

Plaintiffs contend that Ordinance 127 imposed an apportionment scheme in the respective councilmanic districts violative of the Denver charter and the equal protection clause of the fourteenth amendment to the United States Constitution. They assert that the disparity in the population and the similar disproportion in the voter population among the nine councilmanic districts debases plaintiffs' votes with relation to the vote of other persons residing in other districts.

It is Denver's position that the city charter requires

that the councilmanic districts be "divided as nearly as practical so that they contain the same number of voters." (Charter, section B1.3.) It was asserted that Ordinance 127 generally altered the district boundaries previously defined in Ordinance 98, Series 1963, so as to more evenly distribute the voter population among the nine districts, and was based upon voter registration statistics prepared by the Denver Election Commission and certified to the Council as accurate as of January 25, 1967.

At the trial, the court had before it certain exhibits consisting of voter registrations as of January 25, 1967, and voter registrations as of the date the election was held. Also in evidence were population statistics based on the 1960 census and other figures predicated on estimates of growth including certain annexations between 1960 and 1967. These showed wide variations among the districts. Nevertheless, the district court declared Ordinance 127 valid; it found that it complied with the Denver city charter, and ruled that the apportionment did not violate any provision of the United States and State of Colorado constitutions. The court dismissed the action and refused to enjoin the scheduled run-off election of June 20th in districts where no councilmanic candidate received a majority of all votes cast in such districts, and in which the two persons having the highest votes were vying for final election.

██ Preliminarily, Denver has challenged plaintiffs' right to test the validity of the apportionment resulting from the enactment of Ordinance 127. It is urged by Denver that the instant action concerns purely public rights and that plaintiffs, therefore, were obliged to institute the proceeding through the attorney general or district attorney rather than commencing the action independently and in their own persons. This argument is without merit. Plaintiffs allege that Ordinance 127 denies each a personal right to exercise his franchise on a parity with other voters in other councilmanic districts

in the City and County of Denver. An individual's right to vote is a personal right, and where facts are alleged showing an impairment of that right, the individual has the standing to sue. *Gray v. Sanders*, 372 U.S. 368, 83 S. Ct. 801, 9 L. Ed.2d 821; *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed.2d 663.

Whatever doubts existed or whatever disparity of views prevailed at the time of the lower court decision as to whether the "one man, one vote" principle of *Reynolds v. Sims*, 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed.2d 506, applied to units of local government, was dispelled when on April 1, 1968 the United States Supreme Court extended the rule in *Avery v. Midland County, Texas*, 390 U.S. 474, 88 S. Ct. 1114, 20 L. Ed.2d 45. The following apt language in the *Avery* case is decisive of the issue herein involved:

"Although the forms and functions of local government and the relationships among the various units are matters of state concern, it is now beyond question that a State's political subdivisions must comply with the Fourteenth Amendment. The actions of local government *are* the actions of the State. A city, town, or county may no more deny the equal protection of the laws than it may abridge freedom of speech, establish an official religion, arrest without probable cause, or deny due process of the law.

"When the State apportions its legislature, it must have due regard for the Equal Protection Clause. Similarly, when the State delegates lawmaking power to local government and provides for the election of local officials from districts specified by statute, ordinance, or local charter, it must insure that those qualified to vote have the right to an equally effective voice in the election process. If voters residing in oversize districts are denied their constitutional right to participate in the election of state legislators, precisely the same kind of deprivation occurs when the members of a city council, school board, or county governing board are

elected from districts of substantially unequal population. * * *

"That the state legislature may itself be properly apportioned does not exempt municipalities from the Fourteenth Amendment. While state legislatures exercise extensive power over their constituents and over the various units of local government, the States universally leave much policy and decision making to their governmental subdivisions. Legislators enact many laws but do not attempt to reach those countless matters of local concern necessarily left wholly or partly to those who govern at the local level. What is more, in providing for the governments of their cities, counties, towns, and districts, the States characteristically provide for representative government — for decision making at the local level by representatives elected by the people. And, not infrequently, the delegation of power to local units is contained in constitutional provisions for local home rule which are immune from legislative interference. In a word, institutions of local government have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life of more and more of our citizens. We therefore see little difference, in terms of the application of the Equal Protection Clause and of the principles of *Reynolds v. Sims,* between the exercise of state power through legislatures and its exercise by elected officials in the cities, towns, and counties."

■ On the record as made before the district court there is no room for argument that the apportionment brought about by Ordinance 127 is violative of the principles now laid down by the United States Supreme Court. On the basis of the number of registered voters as of January 25, 1967, the largest district had 43% more voters than the smallest district. Other significant disparities existed between other districts. Voter figures introduced into evidence showing the actual number of registered voters as of the date of the election reveals

that the largest district had 63% more voters than the smallest district. The result was equally disproportionate when using the population figures. The count under the 1960 census figures revealed that the largest district had 67% more people than the smallest district, and on the basis of the 1960 census plus estimates of growth, including annexation subsequent to 1960, the largest district had 47% more people than the smallest district. This disparity cannot be rationalized on any basis when it was revealed in the trial that variances in representations less flagrant than those shown in this case have been invalidated in a large number of cases too numerous for citation here.

The city council had the means and mechanics of accomplishing an acceptable and valid apportionment, and this was demonstrated by the fact that the state legislature at about the same time apportioned Denver into 18 representative districts based simply on Denver Election Commission precincts and achieved variation of only 696 persons between the largest and smallest district. We hold, therefore, that Ordinance 127, Series 1967, is invalid and violative of the United States Constitution.

II.

The next question remaining for our determination is whether the charter of the City and County of Denver is unconstitutional because it requires a certain type of apportionment which will provide as nearly as practicable the same number of *voters* in each councilmanic district as distinguished from equality in population. In our view the charter imposes a standard of apportionment neither stricter nor more flexible than that required under the fourteenth amendment. Adherence to the charter provision compels an apportionment of equal numbers. Therefore the charter itself is not inconsistent with the requirements of the federal constitution, and it is our duty to so construe it if

possible. *City of Denver v. Londoner,* 33 Colo. 104, 80 P. 117; *Pueblo County v. Smith,* 22 Colo. 534, 45 P. 357.

An apportionment plan which is based on voter registration is not per se violative of the constitution, but its application must produce a distribution sufficiently comparable to that which would result from apportionment strictly in accord with population. In *Burns v. Richardson,* 384 U.S. 73, 86 S. Ct. 1286, 16 L. Ed.2d 376, the United States Supreme Court reviewed an apportionment of Hawaii's state legislature based on voter population. It was therein stated:

"* * * The Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured. * * * Neither in Reynolds v. Sims nor in any other decision has this Court suggested that the States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime, in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured. The decision to include or exclude any such group involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere. * * *." (footnote omitted) 384 U.S. at 91-2, 86 S. Ct. at 1286, 16 L. Ed.2d at 390-91.

It was further pointed out in the *Burns* case that the use of actual voter basis presents many problems. The court said:

"* * * Such a basis depends not only upon criteria such as govern state citizenship, but also upon the extent of political activity of those eligible to register and vote. Each is thus susceptible to improper influences by which those in political power might be able to perpetuate underrepresentation of groups constitutionally entitled to participate in the electoral process, or perpetuate a 'ghost of prior malapportionment.' Moreover, 'fluctu-

ations in the number of registered voters in a given election may be sudden and substantial, caused by such fortuitous factors as a peculiarly controversial election issue, a particularly popular candidate, or even weather conditions.' Ellis v. Mayor & City Council of Baltimore, 352 F.2d 123, (130 C.A. 4th Cir. 1965)."

We hold, however, that it was in the application of the charter provision by the enactment of Ordinance 127 that the apportionment failed to satisfy the equal protection clause. This is because on the record it was shown to have produced such a divergence from equal apportionment that it became incumbent upon Denver to come forward "with specific proof of permissible considerations that necessitated the particular variance." *Ellis v. Mayor and City Council of Baltimore,* 352 F.2d 123, 126 (4th Cir.); *Kilgarlin v. Hill,* 386 U.S. 120, 87 S. Ct. 820, 17 L. Ed.2d 771; *Swann v. Adams,* 385 U.S. 440, 87 S. Ct. 569, 17 L. Ed.2d 501. This Denver failed to do.

The evidence shows that the ordinance was passed on April 17th, and that registered voter figures of the previous January were used. While, as we have said before, the use of registration figures is not unconstitutional per se, the record demonstrates the inequities that flow therefrom and the danger inherent therein. On the basis of the January figures, district 5 contained 25,549 registered voters whereas district 7 contained 17,874, a disparity of approximately 8,000 voters. It is significant to note that at the time of the election 3,000 additional voters were registered in district 5, bringing the number to 28,429; in district 7 there were only 19,386 voters, and in district 8 only 17,487 voters. This produced a disparity of approximately 9,000 votes as between districts 5 and 7, and 11,000 as between district 5 and district 8. The population divergences were even more glaring. In district 8 with the largest population (69,538) there existed the smallest voter registration, namely 17,487. District 4, with 41,666 population contained 28,000 persons fewer

than in district 8, but district 4 had 25,861 registered voters on election day as compared to 17,487 in district 8. It seems apparent on the face of the record then that there was no attempt to compare voter registration figures — decisive and current — to the population of councilmanic districts.

Therefore, our constitutional approval of Denver's charter mandate for apportionment can hold up only insofar as the city council applies the charter so that it does not depart significantly from population-oriented standards.

In the light of our conclusion that the apportionment plan in Ordinance 127 is invalid, we next consider the appropriate remedy.

Plaintiffs urge that the May 16th city council election should be declared void. This drastic result is by no means compelled by the fact that the apportionment plan has been held unlawful. Numerous federal courts have permitted elections to stand pursuant to unconstitutional apportionments. *Kilgarlin v. Hill, supra; Drum v. Seawell,* 249 F.Supp. 877 (D.C. 1965), *aff'd* 383 U.S. 831, 86 S. Ct. 1237, 16 L. Ed.2d 298; *Toombs v. Fortson,* 241 F.Supp. 65 (N.D. Ga.), *aff'd* 384 U.S. 210, 86 S. Ct. 1464, 16 L. Ed.2d 482; *Delozier v. Tyrone Area School Board,* 247 F.Supp. 30 (W.D. Pa.); *Maryland Citizens Committee for Fair Congressional Redistricting v. Tawes,* 228 F.Supp. 956 (D. Md.).

The May 16th election must be upheld to avert serious disruption of the Denver governmental functions. We also believe that it is necessary that the courts defer to the Denver city council in the formulation of an apportionment plan consistent with the Denver charter and the equal protection clause of the fourteenth amendment. This approach minimizes interference by the judiciary with municipal legislative prerogatives and affords the governmental body most familiar with the districts and precincts involved with a primary opportunity to remedy the malapportionment. Therefore, the district court is

directed to reinstate the action and retain jurisdiction of the cause to assure that the 1971 city council election in Denver will be held according to a lawful standard of apportionment.

The judgment is reversed and the cause remanded with instructions to proceed in consonance with the views herein expressed.