Edmond J. GONG, Maxine E. Baker, Ruth
Owens Kruse, and Joyce Ann Griffin,
Plaintiffs,

v.

Farris BRYANT, as Governor of the State
of Florida, et al., Defendants.

Civ. No. 64-143.

United States District Court
S. D. Florida.

May 11, 1964.

Paul & Sams, Miami, Fla., for plaintiff.

John U. Lloyd, County Atty., Fort Lauderdale, Fla., James W. Kynes, Atty. Gen., Tallahassee, Fla., Darrey A. Davis, County Atty., Miami, Fla., for Board of County Commissioners of Broward County, Fla.

CHOATE, District Judge.

Complaint herein was filed March 3, 1964, alleging that present apportionment of members of the House of Representatives of the United States Congress, within the State of Florida, by virtue of Section 8.01, Florida Statutes, F.S.A. is unconstitutional. Jurisdiction is invoked under 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. § 1343(3), 28 U.S.C. § 2201 and 28 U.S.C. § 2281. The relief sought is a declaration that Section 8.01 of the Florida Statutes, F.S.A. is unconstitutional, with a prayer for injunctive relief against the enforcement of that Florida statute.

Thereafter, the plaintiffs filed a motion for preliminary injunction, which was noticed for hearing on April 6, 1964. The County officials appeared by their respective County Attorneys, admitted all matters alleged in the complaint, and joined in plaintiffs' prayer for relief. The State officers appeared by the Attorney General, and admitted all allegations of the complaint, excepting: (1) the allegation that a voter in the Eighth or Ninth Districts has twice the representation of a voter in the Third or

Fourth Districts, and three times the representation of a voter in the Sixth District; and (2) the allegation that the division of Florida into Congressional Districts, by Section 8.01, is arbitrary, capricious, prejudicial and violative of the United States Constitution, namely Article I, and the due process and equal protection clauses of the Fourteenth Amendment. These allegations were denied.

Thereafter, the matter came on before the Court for hearing on plaintiffs' motions for a preliminary injunction, and for judgment on the pleadings. At the hearings, there was agreement by all parties that the Congressional Districts created by Section 8.01 of the Florida Statutes, F.S.A., if continued, would be held unconstitutional by authority of Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).[1]

Since the parties agree that the apportionment of population within the present Florida Congressional Districts does not meet the goal of "equal representation for equal numbers of people" laid down in Wesberry v. Sanders; this Court must turn to suggested methods of change and the alternatives which have been presented to it as modes of relief. Neither Baker v. Carr[2] nor Wesberry v. Sanders required that the United States Supreme Court reach the question facing the trial judge who must fashion specific decrees to remedy the wrongs decried by those decisions. Indeed, considering the fact that the Wesberry decision placed in doubt the Congressional apportionment of approximately eighty percent of the States, and that the situation in each differs from the others, it is obvious that a specific remedy fashioned for any particular State might well vary from the remainder.

The plaintiffs urge that they are entitled to immediate relief, and their prayer for an injunction against the present electoral process envisions two alternative results. The first is a hope that issuance of an injunction will cause the Governor of the State to call a special session of the Legislature, which will in turn immediately redistrict the State in a constitutional fashion. The Court is told that it would be possible for such redistricting to be accomplished in time for the State's electoral process to begin all over again, and for candidates for Congress to qualify, campaign, survive the primaries, and emerge before the voters prior to the general election next November.

The plaintiffs further urge that, if the Legislature fails to act, or if the time to act proves insufficient, this would not be of any great moment because, as a:

1. The parties agree that the Districts created by § 8.01, Florida Statutes, F.S.A. contain the following populations according to the 1960 census, the average population per district being 412,630:

| District | Population | Ratio to Average |
|----------|-----------|------------------|
| First | 379,288 | .92 to 1 or — 8.08% |
| Second | 455,111 | 1.10 to 1 or + 10.36% |
| Third | 500,000 | 1.21 to 1 or + 21.17% |
| Fourth | 482,968 | 1.17 to 1 or + 17.04% |
| Fifth | 377,421 | .91 to 1 or — 8.53% |
| Sixth | 660,335 | 1.6 to 1 or + 60.03% |
| Seventh | 405,611 | .98 to 1 or — 1.70% |
| Eighth | 241,250 | .58 to 1 or — 41.53% |
| Ninth | 237,235 | .57 to 1 or — 42.50% |
| Tenth | 397,788 | .96 to 1 or — 3.59% |
| Eleventh | 439,578 | 1.06 to 1 or + 6.53% |
| Twelfth | 374,655 | .9 to 1 or — 9.20% |

From the foregoing it can be seen that only the Third, Fourth and Sixth Districts, with above-average population, and the Eighth and Ninth Districts, with below-average population, vary to a substantial degree from perfect apportionment according to the average.

2. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

second alternative, the candidates for the House of Representatives could run at-large. As authority for at-large elections, the plaintiffs cite Florida Statute, Section 99.091(2)[3], F.S.A. as requiring this result, in the absence of redistricting.

The State Attorney General has urged that the Court's decree be so fashioned as to recognize as valid the results of the present primaries, and to allow the election machinery now in operation to continue and leave to the Florida Legislature, next meeting in regular session in April of 1965, an opportunity to perform its constitutional function in an orderly and reasoned fashion.

As will appear below, the Court is of the opinion that this case is not yet ripe for the intervention of the extraordinary power of this Court's equitable jurisdiction.

"There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issue of an injunction." Truly v. Wanzer, 46 U.S. (5 How.) 141, 142, 12 L.Ed. 88 (1847).

"Where a federal court of equity is asked to interfere with the enforcement of state laws, it should do so only 'to prevent irreparable injury which is clear and imminent.' * * *" A. F. of L. v. Watson, 327 U.S. 582, 593, 66 S.Ct. 761, 766, 90 L.Ed. 873 (1946).

"Even if we assume that * * * (plaintiffs') constitutional rights have been violated, the questions arise whether, in those circumstances, the equity arm of the federal courts can now be extended to give effective relief; and whether the relief, if given, might not do more harm than good, might not indeed either disrupt the * * * election altogether or disfranchise more persons than have been disfranchised by the application of the questioned * * * procedures." MacDougall v. Green, 335 U.S. 281, 285–286, 69 S.Ct. 1, 3, 93 L.Ed. 3 (1948) (Mr. Justice Rutledge, concurring.)

The plaintiffs rely on the majority opinion of the two District Judges in Calkins v. Hare, 228 F.Supp. 824 (E.D. Mich.1964) to support their contention for immediate relief. However, in that case the opinion of Circuit Judge O'Sullivan [4] seems far from persuasive, and consonant with our Federal system. Indeed, the facts and circumstances of this Michigan case are so close to those of the case at bar that this Court could adopt Judge O'Sullivan's opinion almost verbatim. It should be pointed out, moreover, that his comments concerned an action brought in June of 1962, as contrasted with this case which was first brought almost two years later, with the Florida primary balloting required to be held on May 5, 1964, and the primary election machinery already in full motion. Appropriate to this case then, is the following language of Judge O'Sullivan:

"Becoming restraint has always marked equity's employment of its extraordinary writs. There is nothing about the facts of this case that should, in my view, cast us in the role of avenging angels. The vice which we now find in Act 249 is actually much less than what has been traditional in the great majority of the states of the Union in the many years that comprise the political history of Michigan and the United States. We now find errors in the practices of such history. This fact, however, does not, in my view, compel us to command almost

---

3. The text of the statute provides:
"When Florida is entitled to additional representatives according to the last census, representatives are elected from the state at large and at large there- after until the state is redistricted by the legislature."

4. Judge O'Sullivan dissented in part from the majority on the Three-Judge court.

instant action by the complex machinery of a state government lest the setting of tomorrow's sun leave unrepaired even one small error. I would be ill at ease in such an enterprise.

"We should never withhold our writs when serious damage would flow from such withholding, nor should we hesitate to command instant obedience when public good or private right call for it. But such is not the case before us. The malapportionments that were involved in the cases we follow, Wesberry v. Sanders and Martin v. Bush [376 U.S. 222, 84 S.Ct. 709, 11 L.Ed. 2d 656], were glaring in comparison to the Act we now strike down. * * * *I cannot believe that toleration of this disparity for a reasonable time would be a wrong commensurable with the burdens that the majority's writ would place on the Michigan Legislature. Likewise, the immeasurable wrong to the voters of the entire state which would follow an order that the coming elections be at large, far outweighs quixotic and dramatic vindication of the hypothetical voter whose vote might be diluted* to the extent of the above ratios. (emphasis added)

"New definitions and new guidelines have put the Federal Courts into position of unprecedented power over state legislatures. The respect that we owe to our coequals in the grand scheme of our government suggests avoiding unseemly displays of power or the flexing of our judicial muscles." Cf., Hearne v. Smylie, 225 F.Supp. 645 (D.Idaho 1964).

■ This Court takes judicial notice of the vast expense which would be placed on the State of Florida, the major political parties, and the candidates, if the extraordinary relief sought by the plaintiffs were to be granted, and the State at this late date called upon to redistrict prior to the general election.

Further, if the State in such situation should fail to act and elections at-large should be ordered, it is equally apparent that the franchise rights of the very citizens for whom these plaintiffs purport to act would be in jeopardy. By way of example only, reference is made to the voters of Dade County. The incumbent Congressmen for the Dade County districts have now been nominated in the primary election of May 5, 1964. If that primary election were held void, and these gentlemen were forced to run at-large, it does not require much stretch of the imagination to envision them drawing substantial out-of-district opposition and a possibility of defeat.

Although the foregoing is pure speculation, it serves to illustrate with reason the possibility that the plaintiffs, if they prevailed in this Court on the pending motions could deny to the people of Dade County and other districts, the representation desired by a majority of them.

■ Furthermore, the plaintiffs seem to assume that an at-large election would be self-enabling upon the entry of the proposed injunction. The Court takes judicial notice that the statutory scheme of holding elections, although broad in scope, does not contemplate the special circumstances which would result from a decree such as the plaintiffs seek. The time for the first and second primaries are specifically fixed by the Florida Statutes, sections 100.061 and 100.091, F.S.A. There appears to be no statutory provision for special primaries in Florida. Although section 100.101 provides special elections, it would seem to contemplate nothing short of a general election, and then only upon the condition that the office to be filled has become vacant.

■ In brief, a review of the entire statutory scheme contained in Title IX, Chapters 97 through 107 of the Florida Statutes, F.S.A. makes it clear that the relief sought here would not only invalidate section 8.01, of which the plaintiffs complain, but would require a revision of the entire Congressional electoral process in Florida. The result would be to require the Legislature to

meet and create new election machinery in order to conduct even an at-large election including at-large primaries and a state-wide special election.

The Court recognizes that there have been a goodly number of Congressmen elected at-large within the various states from the inception of our system to the present. However, with growth in population this practice has come to be the exception and not the rule. Further, as pointed out by the Supreme Court in Wesberry v. Sanders [5] the founders of our Constitution envisioned Congressional representation *by districts*, and not by States. In the flurry of citation to the Federalist in the Westberry decision, the Court did not find it necessary to call attention to Mr. Madison's argument in No. 56.[6] Therein, he contended:

> "The SECOND charge against the House of Representatives is, that it will be too small to possess a due knowledge of the interests of its constituents. * * *

> "But will not this (a knowledge of the objects of federal legislation) also be possessed in sufficient degree by a very few intelligent men, diffusively elected within the state? Divide the largest State into ten or twelve districts, and it will be found that there will be no peculiar local interest in either, which will not be within the knowledge of the representative of the district * * *

> "The representatives of each State will bring with them * * * a local knowledge of their respective districts, * * *"

A study of constitutional sources would seem to make it clear that district representation in Congress was the deliberate choice and intent of our founding fathers. Moreover, the concept of district representation seems to have

more historical substance to recommend it than even the new rule of exact mathematical equality within districts.[7]

It should be noted that the Florida Legislature has been diligent in redistricting the State at frequent intervals. The Legislature acted in 1935, 1943, 1951 and 1961. The latter date marked the passage of the present statute under attack here. Faced with one of the fastest growing populations in the Union, the Legislature has drawn new districts on an average of every seven and one half years for the past thirty years. No evidence has been presented of gerrymandering or other irregularity, and no evidence appears that this latest law was not passed in good faith, and in reliance on the recognized constitutional law existing at the time of its passage, without intent to deprive any citizen of rights guaranteed under the United States Constitution.

Additionally, not only has the State been faced with a rapidly expanding population, but this population has exploded in a very irregular fashion. This has placed additional burdens on the Legislature. Thus, our largest district, the Sixth, now has a population of 660,335. In 1950 it had only 244,560 citizens on the census rolls. A decade ago the Sixth Congressional District had a population no larger than the two smallest districts of the State have at present. To be contrasted with the increase of almost three hundred percent in the Sixth District is the relatively stable population of the two smallest districts, one of which increased only twenty percent between 1950 and 1960, while the other increased less than ten percent.

These facts are even more pertinent when considered in the light of all socioeconomic forecasts predicting continuation of Florida's rapid growth, which will in turn require almost constant re-

---

5. 376 U.S. at 15, 84 S.Ct. at 534.

6. Federalist, No. 56 (Wright ed. Harvard Press 1961).

7. Harlan, J. points out the historical problems involved in the one voter—one vote concept in his dissent, 376 U.S. 20, et seq., 84 S.Ct. 536.

adjustment of the Congressional districts.

In view of the foregoing, the Court concludes that:

(1) There is considerable doubt that the remedy of injunction, as suggested by the plaintiffs, would not engender more harm than the alleged evil sought to be remedied;

(2) By the employment of its equitable powers, as importuned by the plaintiffs, this Court cannot at this time ensure complete justice to the body politic of the State of Florida;

(3) This Court cannot, moreover, find a clear and imminent, irreparable injury being suffered by the plaintiffs at this time.[8]

The Court is not now concerned with the fact that it may later be urged that the Congressmen now being elected from Florida may be said to be serving unconstitutionally. If we are to speculate, it could be urged that 398 Representatives from 37 states in the present Congress became unconstitutional on February 17, 1964.[9] The actualities of our political life under the Constitution prevent such an incongruous result so long as the Congress itself decides who shall be seated and who shall not.

In conclusion some comment by the Court as to its interpretation of the words, "equal protection for equal numbers of people," [10] is perhaps necessary. Based on our present average of about 400,000 people per district, the Legislature may take a reasonable approach in any new plan to approximate equality. The Court notes that exact apportionment can probably never be achieved since the population of the State will apparently continue to vary as much as five percent per year, and perhaps more, in certain areas, and the Legislature meets only in biennium sessions.

Wherefore, it is

ORDERED, ADJUDGED AND DECREED that the plaintiffs' motion for a preliminary injunction against the defendants, to prevent them from complying with Section 8.01 of the Florida Statutes, F.S.A. is hereby denied, without prejudice; and decision upon the plaintiffs' motion for judgment on the pleadings is reserved until sixty (60) days after adjournment of the next session of the Florida Legislature, due to be held April 1, 1965, when the Court, upon motion of any party, will review the matter in light of the constitutional standards requiring "equal representation for equal numbers of people".

8. The system by which Florida is presently apportioned has been in existence for 175 years. Its continued existence for an additional year until remedied by the orderly process of the Legislature, which is charged with the primary duty of revision, would appear to be an evil of minimal proportion under the facts and circumstances of this case.

9. Harlan, J. dissent, 376 U.S. 1, at 20, 84 S.Ct. 526, at 536.

10. The Supreme Court holds that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Wesberry v. Sanders, supra, 376 U.S. at 7–8, 84 S.Ct. at 530. Although this can readily be accomplished within a single district, it is difficult to see how this can ever be achieved as between two or more districts of the same State, so long as districting is based on the number of "inhabitants" rather than the number of electors or voters; id., Harlan, J. dissenting, 376 U.S. at 42–45, 84 S.Ct. at 547–549; or between the districts of any two States as long as Article I, Section 2 of the Federal Constitution guarantees each of the States "at least one Representative", and Section 2 of the Fourteenth Amendment requires that: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."