STANLEY J. TROHIMOVICH, ANNA MAE TROHIMOVICH, ESTATE
OF RICHARD A. TROHIMOVICH, DECEASED, MERITA M.
TROHIMOVICH, EXECUTRIX, AND MERITA M. TROHIMOVICH,
INDIVIDUALLY, PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 7879–78.     Filed August 10, 1981.

## OPINION

DRENNEN, *Judge*: An order was entered by this Court dated
July 21, 1981, adjudging Stanley J. Trohimovich (hereinafter
Stanley) to be in criminal contempt of this Court for refusing
to comply with two subpoenas issued by this Court and one
direct order of this Court to produce certain books and records
of Grays Harbor Motors for use in the trial of this case. The
order referred to the transcript of the contempt hearing held
in Seattle, Wash. on July 21, 1981, for cause. This memoran-
dum will summarize the reasons the Court reached the
conclusion reflected in the contempt order (copy attached).

A brief review of Stanley's actions relative to filing tax
returns and his relationship with the Internal Revenue
Service, the Tax Court, the United States District Court, and
other Government officials during the past 10 years is
important to a complete understanding of the circumstances
surrounding the contempt citation.

Stanley and his brother, Richard, now deceased, operated as
partners a Volvo automobile business in Aberdeen, Wash.,
under the name Grays Harbor Motors. They and their wives,
Anna Mae and Merita, respectively, filed joint income tax
returns for 1971 reporting income from Grays Harbor Motors.
For the years 1972 and 1973, they filed income tax return
forms but entered no figures for income or deductions, filling
in various articles of the Constitution instead. Upon audit of
the above returns, they refused to allow the revenue agents

access to the books and records of Grays Harbor Motors to verify or compute the income of the partnership. Consequently, the Revenue Service computed their taxable incomes by an indirect method, using whatever third-party records they could find, and issued notices of deficiencies to the Trohimoviches. They filed a petition in this Court for redetermination of those deficiencies, but when the case was called for trial, they refused to produce evidence of their taxable incomes, so on respondent's motion, the Court dismissed the case for failure to prosecute and entered decisions against them in the amount of the deficiencies determined in the notices of deficiency.

Subsequently, it appears from the opinion of the United States District Court for the Western District of Washington, at Seattle, in the case of *Clark v. McGovern*, filed November 18, 1976, Stanley and others in a group of tax protesters (for lack of a better designation) brought numerous legal actions from time to time against Federal judges, U.S. attorneys, and other Government officials. In *Clark v. McGovern*, the court found that the pending action, against a District Court judge and the U.S. attorney, was groundless and frivolous and brought to vex, harass, and annoy Federal officials and the courts. The opinion stated that the petitioners had been put on notice that the Federal courts could not possibly grant relief or recognize defenses based on the legal theories advanced by petitioner, particularly any claim containing a necessary premise that the Internal Revenue Code is unconstitutional. Consequently, it dismissed the action and granted a permanent injunction against certain named individuals, including Stanley, enjoining them from filing any more similar suits relying on similar arguments, unless first obtaining the permission of the courts.

For the years 1974 and 1975, which are involved in this proceeding, Stanley and Richard, and their respective wives, filed joint income tax forms giving no information about their taxable incomes, citing only provisions of the Constitution. When they were again denied access to any books or records, the revenue agents auditing these so-called returns again computed the taxable incomes of the Trohimoviches by an indirect method similar to that used for 1971–73 and determined the deficiencies that are here in dispute. The Trohimo-

viches filed petitions in this Court in 1978 seeking a redetermination of their tax liabilities for 1974 and 1975, and the cases of all four were consolidated and assigned docket No. 7879–78 (Richard Trohimovich died in late 1980 and his wife, Merita, as executrix of his estate, has been substituted as a petitioner). After several false starts, this case was set for trial in Seattle on December 11, 1980. When the case was called for trial, Stanley refused to comply with a subpoena issued by this Court, at respondent's request, to produce the books and records of Grays Harbor Motors. Although being advised repeatedly by the Court that the books and records were necessary and that it would be useless to proceed with the trial without them, Stanley persisted in his refusal to produce them. Thereupon, the Court dismissed his case for failure to prosecute. Since Richard had died and no representative had been appointed for his estate, the Court continued the other three cases. The Court withheld the decision in Stanley's case pending the outcome of the other three cases. See memorandum sur order of Judge C. Moxley Featherston dated March 3, 1981.

Merita Trohimovich, widow of Richard, was appointed executrix of Richard's estate, and the cases of the other three petitioners were set for trial in Seattle on May 11, 1981. On May 4, 1981, respondent served a Court-issued subpoena on Stanley to produce specified books and records of Grays Harbor Motors for use at the trial on May 11, 1981. Merita had also written Stanley asking him to produce the books and records. Stanley, his wife, Anna Mae, and his sister-in-law, Merita, answered the call of the case on May 11. Although he was advised that his case was not involved, Stanley orchestrated the proceedings. He refused to comply with the subpoena and Merita's request to produce the books and records. The case was set for trial on Wednesday, May 13, and Stanley was ordered by the Court to produce the books and records at that time. When Stanley refused to produce the books and records on May 13, Merita asked for time to employ an attorney to represent her and Richard's estate. The case was continued to Friday, May 15. Merita obtained the services of an attorney on May 13, and a subpoena was issued at her request and served on Stanley on May 14 to produce the books and records on May 15. When the case was called for trial on May 15, Merita and

her attorney and Anna Mae were present but Stanley was not. After a telephone call from Anna Mae, Stanley did appear in court but again refused to comply with the subpoena served by Merita. Counsel for Merita and Richard's estate moved for a continuance of the case to give him time to familiarize himself with it and determine what procedure to follow in behalf of his clients. The motion was granted.

Stanley was then advised by this Court that if he did not produce the books and records he risked being cited for contempt of court and was advised of the consequences thereof. Stanley persisted in his refusal to obey the Court's orders to produce the books and records, so the Court cited him for contempt of court and set a hearing on the citation for July 21, 1981, in Seattle, and advised Stanley of his rights and the procedure that would be followed. Because of the fact that this Court does not sit continuously in Seattle and the Court's conclusion that Stanley would not be coerced into producing the books and records by a civil contempt citation, the Court cited Stanley for criminal contempt, and an order and notice setting the time for hearing was issued on May 21, 1981 (copy attached).

At the contempt hearing on July 21, 1981, Stanley offered the testimony of three witnesses from the Aberdeen area who testified that Stanley had the reputation in his home area of being an advocate of obedience rather than disobedience of the law. They were asked no questions about the disobedience we are concerned with here. Stanley, himself, testified that he was a law-abiding citizen and had no intent to violate any law by refusing to obey the orders of this Court mentioned above because he did not believe the orders of the Court were lawful or valid.

The petition in this case, while rambling and lengthy, appears to rely primarily on arguments that neither the Internal Revenue Service nor this Court has authority to determine petitioner's tax liability because the 17th Amendment to the Constitution, which changed the method of electing senators to the U.S. Congress, was improperly proposed and/or adopted, and therefore all laws enacted by Congress (and the Senate) subsequent to at least 1919 are invalid. This included the Internal Revenue Code and the legislation which established this Court. The petition also

alleged that the actions and methods used by the revenue agents and the Internal Revenue Service in determining petitioners' taxable income for 1974 and 1975 were unlawful and constituted a crime, and that a "Notice of Felony" sent by petitioners to this Court and numerous Government officials, presumably pursuant to title 18, U.S.C. sec. 4, in some way precludes any proceeding to determine their tax liability until someone prosecutes the Internal Revenue Service or agents thereof for the crimes petitioners claim they have committed, which are not specified.

Throughout these proceedings, Stanley has filed numerous lengthy motions and other documents, usually at the last moment, espousing various legal theories that have occurred to him for dismissing or delaying this case. For example, he telephoned the Clerk of the Tax Court on the afternoon of Friday, July 17, 1981, to advise that he was filing a notice of appeal from one of the Court's rulings issued during the week of May 11 through 15, accompanied by a motion to stay the contempt proceedings. These documents were not received by the Court until after the judge had left Washington, D.C., for Seattle at 5 p.m., Monday, July 20. On Tuesday, July 21, the date of the contempt hearing, the Clerk of the Court received in Washington, D.C., five documents entitled (1) "Petitioners' motion for stay in all proceedings until Judges of this Court and the employees of the United States stop the pretext (or sham) of compliance with the laws of the United States (including the United States Constitution, Rule 201 of the Federal Rules of Evidence, and the Rules of Practice and Procedure, United States Tax Court)"; (2) "Petitioners' (and/or witness') motion to correct the corrupt and criminal application and administration of the laws of the United States by Judges Scott, Drennen, Featherston, and Tannenwald"; (3) "Petitioners' motion for information"; (4) "Petitioners' motion to discharge all proceedings for lack of subject matter jurisdiction"; and (5) "Petitioners' (Stanley J. Trohimovich) motion for stay of all oral orders at the May 11, 1981, Seattle trial session of the Court in the above docket number (with the exception of the oral order made with reference to the appointment of an executrix to appear for the Richard Trohimovich Estate)." All of these motions contain numerous citations of authorities, with no explanation of their relevance or application, which

the Court could not possibly have reviewed prior to the scheduled hearing, even if they had been received in Seattle.

At the contempt hearing, Stanley argued that since this was a criminal contempt citation, the requisite intent must be proved beyond a reasonable doubt and that since the only evidence presented was from his witnesses, such intent had not been proved. The Court is not certain to just what intent Stanley refers. Contempt of Court is not a statutory crime which includes intent as a statutory element, such as first degree murder. The distinction between civil contempt and criminal contempt, as we understand it, is not so much in the manner in which the contemptous action is taken nor the intent of the contemnor, but is in the purpose which the adjudication of contempt is to accomplish. Civil contempt has a coercive purpose to compel compliance; the extent of the punishment is dependent upon whether the contemnor purges himself by obeying the Court's order.[1] Criminal contempt has a punitive purpose, to punish defiance of a court order, i.e, to vindicate the authority of the Court. See *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822 (5th Cir. 1976). It is in the public interest and the orderly and expeditious administration of justice that an order of a court with jurisdiction over the subject matter and the person must be obeyed by the parties until it is reversed by proper proceedings. See *Maness v. Meyers*, 419 U.S. 449 (1975). "Even when a Court issues an order which it had not the power or authority to issue, in matters of criminal contempt the disobedient party may be held and appropriately punished. This is true if the order is later found to have been invalid, even to the extent of infringing constitutional rights." *Norman Bridge Drug Co. v. Banner, supra* at 827.

There is no doubt that Stanley knowingly, intentionally, and deliberately disobeyed the orders of this Court, and that such disobedience has delayed and obstructed the orderly and proper disposition of this case. This is particularly true with respect to Merita and the Estate of Richard, who need these records to prosecute their case. The intent necessary to sustain an adjudication of criminal contempt is the intent to perform

---

[1]Although it is not clear, imprisonment for *civil* contempt may be limited to the period the Tax Court sits in a particular locale. See *Shillitani v. United States*, 384 U.S. 364 (1966).

or refuse to perform an act when one knows, or should reasonably be aware, that his conduct is wrongful. *United States v. Seale*, 461 F.2d 345 (7th Cir. 1972). Stanley cannot deliberately disobey an order of this Court and avoid being adjudged guilty of contempt by fabricating legal theories to support a claim that the orders were not lawfully issued. He has been advised by various courts during the past 10 years, implicitly or explicitly, that his arguments were not valid and he has had reason to believe that his actions were wrongful.

We will mention a few of Stanley's legal theories upon which he relies to show that this Court was without jurisdiction or authority to issue the orders to produce and upon which he apparently relies to argue that he had no intent to commit a crime by refusing to produce. Incidentally, when questioned by the Court with regard to his Fifth Amendment plea, the only fear of incrimination mentioned by Stanley was that he could be imprisoned as a result of the contempt proceeding. Of course, incrimination of that sort would result only from Stanley's disobedience of the Court's orders, not his obedience thereof. Practically all of his arguments not mentioned below have been decided by the courts many times. See *Cupp v. Commissioner*, 65 T.C. 68 (1975); *Hatfield v. Commissioner*, 68 T.C. 895 (1977).

Stanley's basic argument seems to be that the 17th Amendment was not properly adopted and therefore all laws enacted by Senators elected under the amendment are invalid. The argument centers around whether article V of the Constitution requires a vote of two-thirds of all the members of both Houses of Congress to adopt a resolution proposing an amendment to the Constitution or whether a vote of two-thirds of those members present is sufficient. This was debated in the House of Representatives in connection with the 17th Amendment on May 13, 1912, at the conclusion of which the Speaker of the House ruled that the vote of only two-thirds of those members present was required, and he declared the resolution adopted. The Secretary of State declared in a proclamation dated May 13, 1913, that the 17th Amendment had been ratified by the legislatures of 36 of the 48 States and was, therefore, a part of the Constitution. In *United States & Lyons v. Sluk*, an unreported opinion (S.D. N.Y. 1979, 44 AFTR 2d 79–6048, 79–2 USTC par. 9650), the United States District

Court for the Southern District of New York upheld the validity of the 17th Amendment. While we have found no higher authority ruling directly on the validity of the 17th Amendment, the Supreme Court and other courts have relied on it. See *MacDougall v. Green*, 335 U.S. 281 (1948); *Phillips v. Rockefeller*, 435 F.2d 976 (2d Cir. 1970). While we doubt that Stanley has standing to raise this issue in this proceeding, we disagree with his theory and, in the absence of any authority supporting his view, we do not believe that he sincerely thinks the 17th Amendment is null and void and that all laws passed by the U.S. Senate, by Senators elected under the amendment, are null and void. This argument is similar to Stanley's arguments in other courts that the Internal Revenue Code is unconstitutional, which was enjoined by the District Court in *Clark v. McGovern, supra.*

This Court does not understand how Stanley could expect relief by relying on a "Notice of Felony." Title 18, U.S.C. sec. 4, which he cites as authority, simply provides that it is a felony for anyone, having knowledge of the actual commission of a felony cognizable by a court of the United States, to conceal such knowledge and not make it known to some judge or other person in civil authority under the United States. At best, the "Notice of Felony" sent by Stanley to this Court and numerous other Government officials might protect him from violating that statute but it has nothing to do with the activities of this Court in carrying out its duties under the law. The fact that Stanley claims a felony was committed by the Internal Revenue Service in the audit of his returns does not make it a felony cognizable by a court.[2] Furthermore, the Tax Court

---

[2]Stanley claims that the revenue agents and the Internal Revenue Service committed a crime by computing the income of Grays Harbor Motors by the indirect method they used, and that the partnership could not possibly have earned the net income they determined. We note that the method used was the same method used to compute the partnership income for 1971–73 which was the basis of this Court's decision for those years. All taxpayers are required by law to keep books and records from which their taxable incomes may be determined. Sec. 6001, I.R.C. 1954. If they fail to do so, the Internal Revenue Service may use any reasonable method to determine taxable income. Sec. 446(a), I.R.C. 1954; *Holland v. United States*, 348 U.S. 121 (1954). Whether the method used by the Revenue Service in this case was reasonable cannot be determined without some standard, such as books and records, to judge it by. The burden of proof is on Stanley to prove it was arbitrary and unreasonable, which he has made no effort to carry. But to claim the use of the method was a crime requires a lot more proof than that it was arbitrary and unreasonable. Stanley's bald assertion of criminal intent is certainly not enough. Furthermore, Stanley has been advised time and again that this Court, except on rare occasions, does not look behind the

would have no jurisdiction to do anything about such a felony if one had been committed. Here, again, the Court cannot conceive that Stanley sincerely believes that the "Notice of Felony" has or should have anything to do with the proceedings in this Court in this case. We find this argument to be groundless and frivolous.

With respect to Stanley's argument that this proceeding should be suspended until the Court of Appeals acts on his appeal from this Court's order to produce, the notice of appeal was not filed in time to suspend the contempt hearing. Furthermore, there is a question whether the order he is attempting to appeal is a final appealable order. There is some uncertainty among the circuits on this issue (compare *Ryan v. Commissioner*, 517 F.2d 13 (7th Cir. 1975), with *United States v. Secor*, 476 F.2d 766 (2d Cir. 1973)), but this is something the Ninth Circuit will have to decide. In any event, we do not believe anyone's rights were denied by proceeding with the contempt hearing, even if the notice of appeal from the production order was timely. If the contempt order is appealed, both orders can be considered by the Court of Appeals at the same time.

At the contempt hearing, Stanley, for the first time, raised an argument that being forced to produce his books and records would somehow infringe upon his First Amendment freedom of religion to enforce the Constitution and laws of the United States. He relied upon a recent Supreme Court case, *Thomas v. Review Board of Indiana*, decided April 6, 1981, which he apparently had just come upon. That case is inapposite here. Stanley points to no link between his religious beliefs and the determination of his income tax liability under the Internal Revenue Code.

Based on the history of this case, Stanley's actions with respect to his taxes over the past 10 years, and the frivolous character of his arguments in this case, we think there can be no doubt that Stanley intentionally, knowingly, and deliberately refused to obey the orders of this Court for the purpose of

---

notice of deficiency to assess the method used by respondent in determining the deficiency. If petitioner wants to test respondent's method of computation, he should go to trial and put on his evidence to show that the computation was wrong.

delaying the determination of his and his family's tax liabilities, obstructing the orderly procedures of this Court, and disrupting the tax collection system of this country. He has not shown that obedience to the Court's orders would in any way deprive him of any of his constitutional rights. His exhaustive efforts to press every reason he can think of to delay this case and avoid producing the books and records of Grays Harbor Motors convince us that he is more interested in avoiding the payment of taxes than complying with the law. He has intentionally and knowingly defied the undeniable authority of this Court and we cannot accept his fabricated legal arguments, which have been rejected time and again, as justification for doing so. See *Hatfield v. Commissioner, supra* at page 899.

For the above and other reasons, we have adjudged Stanley to be in criminal contempt of Court and have ordered that he be imprisoned for 30 days.